(C.D. 2065)

D. H. GRANT & Co., INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 13, 1959)

*Siegel, Mandell & Davidson* (*Joshua M. Davidson* and *David Serko* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

*Lamb & Lerch* (*John G. Lerch* of counsel) as *amicus curiae*.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: Certain imported cotton cloth, invoiced as "ALL COTTON VAT DYE CLAN PLAID GINGHAM-WATERPROOFED-SHRUNK FINISH," was classified by the collector of customs at the port of entry within the provisions of paragraph 904 (c) and (d) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and assessed with duty at the combined rates therein provided for its particular yarn count, color, and value. The rate thus assessed totaled 25½ per centum ad valorem.

Plaintiff, herein, duly protesting such action, claims that this importation is more specifically provided for in paragraph 907 of said act, as so modified, as waterproof cloth, dutiable at the rate of 12½ per centum ad valorem.

Insofar as here pertinent, these competing provisions read as follows:

Paragraph 904, as modified by T.D. 51802, *supra*:

(c) Cotton cloth, printed, dyed, or colored, containing yarns the average number of which— | 12% ad val. and, in addition thereto, for each number, ¼ of 1% ad val.
--- | ---
    Does not exceed number 60, if valued at more than 90 cents per pound; or exceeds number 60 but does not exceed number 80, if valued at more than $1.40 per pound | 

     \*      \*      \*      \*      \*      \*      \*

(d) The additional duty to be levied, collected, and paid under paragraph 904(d), Tariff Act of 1930, on cotton cloth woven with eight or more harnesses, or with Jacquard, lappet, or swivel attachments, or with two or more colors or kinds of filling, shall be | 2½% ad val.
--- | ---

Paragraph 907, as modified by T.D. 51802, *supra*:

Cotton window hollands, and all oilcloths (except silk oilcloths and oilcloths for floors); filled or coated cotton cloths not specially provided for; and waterproof cloth, wholly or in chief value of cotton or other vegetable fiber, whether or not in part of India rubber | 12½% ad val.
--- | ---

By reason of its relevance in this case, the following abstract of a customs decision of the Treasury Department, dated October 12, 1954, 89 Treas. Dec. 291, T.D. 53630, is also herein quoted:

(1) *Waterproof cloth*—Cloths of a kind which are not generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrella fab-

rics, and similar articles, *even when such cloths possess water repelling characteristics,* are not classifiable as waterproof cloth within the meaning of paragraph 907, Tariff Act of 1930. Insofar as this decision results in the assessment of duty at a rate of duty higher than that which has heretofore been assessed under a uniform practice, it shall be applied only to merchandise entered, or withdrawn from warehouse, for consumption after 90 days from the date of publication of this abstract. Bureau letter to the collector of customs, New York, New York, October 11, 1954. [Italics supplied.]

As the result of a pretrial conference and certain stipulations entered into during the course of trial, the following facts have been established:

1. That the fabric here in issue passed the 24-hour cup test.

2. That the 24-hour cup test has been the standard adopted by the Government for at least the past 28 years in determining the classification of cloth as waterproof.

3. That merchandise substantially like the quality of the instant importation, as represented by plaintiff's collective exhibit 1, has been uniformly classified as waterproof cloth, whenever imported prior to the promulgation of T.D. 53630, *supra.*

4. That the instant merchandise is wholly or in chief value of cotton.

Additional evidence introduced by the plaintiff consisted first of the testimony of Neville Broughton, joint managing director of Stonebridge Cotton Manufacturing Co., Ltd., of Lancashire, England, the manufacturer and exporter of the merchandise at bar. According to this witness, his company has been engaged in the business of manufacturing cotton goods for the past 70 years, and he has personally been associated with the firm for 50 years. As a consequence, he is familiar with its operations and, in particular, with the facts and circumstances surrounding the production of the merchandise at bar.

It appears from the testimony of this witness that upon receipt from the plaintiff of an order for waterproof cloth, his company contacted the British firm of Catomance, Ltd., "one of the foremost people in the United Kingdom for the manufacture of waterproof products, and submitted a sample of the cloth to them," requesting the "best possible ingredients or product to make the cloth waterproof." Catomance furnished a product called Mystolene[1] and, later, an additional substance called Mystolene R.E.T.,[1] together with instructions as to use.

In the preparation of the instant cloth, the fabric is first singed to remove all loose fibers; then it is desized, washed off, and dried, and then passed through a bath containing the proofing liquid, which consists of equal parts of Mystolene and water, and 6 per centum of Mystolene R.E.T. Thence, it proceeds through rollers, which squeeze out the excess liquid, and over drying tins. It is thereafter calendered, shrunk, and stentored. Essential differences between the

---

[1] These products are inadvertently referred to in the invoice as "Mystox."

54

production of ordinary cotton cloth, and fabric of the type at bar, lie in the desizing process and in the application of the proofing liquid. Cloth which is not proofed does not require desizing, because it is usually filled with a starch mixture, but cloth which is to be proofed will not take the solution unless it is first desized.

Broughton stated that Mystolene and Mystolene R.E.T. were applied for the purpose of making the cloth waterproof pursuant to the request of the importer. He further testified that, although he did not know the definition of the term "waterproof" in the United States, his understanding of the meaning of the word, as used by the customer trade in England, was a substantial imperviousness to water. In his opinion, the cloth at bar, upon which he had performed the so-called cup test to determine whether water penetrated the fabric, conformed to that understanding, and was satisfactory to the purchaser, the plaintiff, herein.

Plaintiff's second witness was Gordon W. Whiston, a director of Catomance, Ltd., which manufactures waterproofing and preservation compounds for the textile, dry cleaning, and laundry trades. It has been in business since 1936. This witness, who had spent the major portion of his adult life with this company, was familiar with with all of its operations. He confirmed the request from Stonebridge Cotton Manufacturing Co., Ltd., to provide "a process to give the highest possible waterproofing effect on a cloth, a sample of which they submitted." After examination of the sample, Catomance, Ltd., recommended Mystolene for waterproofing and Mystolene R.E.T. to provide an improved handle and body to the cloth.

Whiston stated that Mystolene is basically paraffin wax, a protein aluminum formic acid rosin, and that Mystolene R.E.T. is a synthetic rosin emulsion, containing a synthetic rosin, formic acid, a protein, white spirit, and water. These products were originally developed in 1940 and 1947, respectively, at the request of the British Ministry of Supply for a waterproofing substance for application to aircraft covers, which would not break down under severe handling and which would withstand both heat and cold; and the same procedures for their use were recommended.

In the opinion of this witness, Mystolene is a fairly common type of waterproofing compound. The paraffin wax which it contains provides surface repellency; its wood rosin ingredient improves surface repellency. As to the aluminum triformate, it is the metallic salt probably most commonly found in waterproofing products, and if he thought his company produced any substance which would render a fabric more impervious to water than the Mystolene used to treat exhibit 1, he would have recommended it.

Whiston further testified that as his firm is a member of the American Society of Testing Materials, and the American Textile Research

Institute, he is familiar with American testing procedures and standards. Certain American tests, particularly the hydrostatic head test, the cone test, and the spray rating test, are also used in England for the purpose of establishing the performance of a cloth, and since they are entirely different tests, they give different results. His company runs the test which customer specifications or the type of cloth require, to determine the degree of penetration of water or the fabric's capacity for absorption.

Plaintiff's last witness was P. William Fanelli, a graduate chemist, employed since 1942 as chief engineer and supervisor of the New York Testing Laboratories. According to this witness, the New York Testing Laboratories conducts tests of materials and engages in research development, and he personally supervises all branches of the laboratory, except the metallurgical department. At the request of counsel for plaintiff, the laboratory performed a waterproof cup test on a sample of the imported merchandise, in conformity with the procedures prescribed in the United States Customs Laboratory Cloth Waterproof Method, No. 907.1–54, a photostatic copy of which was received in evidence as plaintiff's exhibit 2.

Fanelli described this test in the following language:

In essence we take a sample of fabric, place it in the mouth of a 2-liter beaker which we have cupped according to United States Customs methods. We then pour over onto the cloth 4 millimeters [sic] of water, the sample must then be observed for every 30 minutes, which we did, and if there is no leaking or no penetration, it's to be allowed to stand for 24 hours and then re-observed. After a 24-hour period, we observed the cloth and there was no penetration.

Actually, the test was continued for 96 hours, without evidence of water penetration, although the report of the test (plaintiff's exhibit 3), as per specifications, indicates only the results for the 24-hour period. Since the fabric resisted the penetration of water for 24 hours, the material was considered waterproof, within the specifications of the customs method.

This witness defined "waterproof" as being substantially impervious to water and stated that he did not know of any general test for determining it. He further testified that there are a variety of waterproof tests, but the one selected depends upon the customer's specifications. After testing, the results are shown, but it is "up to the product manufacturer to determine whether it is waterproof or not." However, he admitted that the hydrostatic tests, adopted by the American Association of Textile Chemists and Colorists, are clearer tests than the cup test.

Testifying in behalf of the defendant, David J. Moran, chief of the textile and dye division of the United States Customs Laboratory, and an employee of that office for over 30 years, stated that he is familiar with the cup test, as described in plaintiff's exhibit 2, and

has performed it many times. The test, as originally written by his predecessor, a Mr. Gassmann, in the form expressed in defendant's exhibit A, has been run in the customs laboratory on many occasions; and, notwithstanding the limitations of T.D. 53630, *supra*, it is still the only test used by the customs laboratory.

By way of supplement to the testimony of this witness, it was agreed by respective counsel that, since the effective date of said T.D. 53630, the determination of whether a fabric fulfills the requirements of the Treasury decision is first made by the examiner. If he is satisfied that it does, then he sends the sample to the laboratory for tests. In the case of the instant merchandise, no sample was submitted to the laboratory.

Defendant's next witness, Arthur Epstein, has been a member of the firm of Sherman Bros., Inc., since 1932. That company manufactures children's and ladies' rainwear, and the testimony of this witness by and large was conditioned by the standards of that trade. He stated that for a fabric to be suitable for use in his industry it must be either waterproof or water repellent, which terms he distinguished as follows:

THE WITNESS: Water repellant is the application as far as I know. I am not a complete technician in the sense of the word, but as far as I know water repellancy is the application of chemicals to a fabric to fill the pores of the fabric fibers, thereby creating a film which will repel water. It can be worn off by wear, by the application of another chemical such as dry cleaning after a period of time. Waterproofing as far as I know, it is similar to you might say almost coating, completely covering one side of the fabric in such a way as to completely close all the pores and all the openings.

BY MR. DAVIDSON:

X Q. Didn't you just advise the Court that water repellancy was closing the pores?—A. No, I don't think so.

X Q. Haven't the pores between the fibers——A. No, the fibers are the twistings between them.

X Q. You know what water resistancy is?—A. It is a resistance of a cloth to water.

X Q. What is water resistance?—A. Exactly what water resistance would mean, would be the resistance of anything that's been termed water resistant, to water being thrown at it in some way or other.

X Q. Doesn't water repellant mean that definition?—A. Yes.

X Q. It meets it?—A. Yes.

X Q. So that in your mind water resistance is the same as water repellant?—A. Yes.

X Q. Mr. Epstein, is there such a thing as water repellant rainwear?—A. That is one of the garments we make, yes.

X Q. I see. And that has the ability to withstand substantial applications of water?—A. Well, the way I would describe it would be to withstand rain for a reasonable length of time. The word reasonable would be what one determines in his own mind.

MR. DAVIDSON: That is all.

MR. SKLAROFF: Mr. Epstein, isn't there a difference between the ability of a fabric to shed water and the ability of a fabric to resist penetration of water?

THE WITNESS: Definitely.

According to this witness, prior to 1950, water repellency in the rainwear trade was determined by the so-called hydrostatic test, which, in substance, consists of raising a cylindrical column of water underneath the surface of a fabric and ascertaining when the water penetrates the fabric. This test was used in connection with a spray test to determine whether or not water repellent chemicals were properly applied. Since that date, the trade has made use of a so-called Raintester machine, an instrument which forces a stream of water from various distances against a stationary piece of fabric held vertically. The distance and height of the column of water and the degree of water retention are then measured to determine whether the fabric is showerproof, water repellent, water resistant, or impervious to water.

This witness expressed the view that whether or not a cloth would be suitable for his end use could be determined by visual inspection. Upon examination of plaintiff's exhibit 1, it was his opinion that even if it were properly treated it would not be suitable, by itself, as a single texture for use as a rainwear fabric, although it might be so used, double fold, if both fabrics were treated separately.

Epstein defined the term "waterproof" as meaning, in the rainwear industry, a fabric absolutely impervious to the passage of water, and stated that, under that definition, plaintiff's exhibit 1 does not appear to be waterproof. He further testified that he had never heard of the cup test as a means of indicating whether or not a fabric was waterproof.

Defendant's witness Harry Neiman testified that he is the president of the Sea Island Mills, a firm which manufactures textile fabrics in general and rainwear fabrics in particular, supplying the rainwear, garment, and sportswear trades throughout the country. When fabrics are prepared by the company for the rainwear trade, they are desized, mercerized, dyed, shrunk, and subjected to a water repellency treatment. The company employs both a spray test and a hydrostatic test to determine the effectiveness of the water repellency treatment, and requires a minimum standard of 30 centimeters, under the hydrostatic test. That means that the cloth must resist a water pressure column of 30 centimeters. A somewhat less severe standard might be accepted if the fabric were not intended for outdoor use in contact with snow, rain, sleet, or storm. The cup test is never used by this firm, and it was inconceivable to this witness that any other textile firm would apply it, since, in his opinion, if the water

in the cup is allowed to remain static, and no air pressure is combined with it, the test is completely unreliable.

Although Neiman admitted that there were several standard methods of testing fabrics with which he was not familiar, it was his opinion that the only legitimate ones were the hydrostatic test and the Raintester. Nevertheless, he also asserted that a visual examination could disclose the suitability of a fabric for rainwear use, and, based upon his examination of plaintiff's exhibit 1, he would not "offer it up for rainwear." His reason for that was, since he could see the light through the fabric, that would indicate that, applying the hydrostatic test, water would flow through the fabric very readily, although there might be some surface shedding if water were merely poured through it. He did not believe that there was any waterproof finish on it as he knows it in the rainwear industry.

He further stated that he would offer the instant fabric to dress manufacturers, children's dress manufacturers, kimono manufacturers, and manufacturers of infants' wear, but not for infants' outerwear under conditions of cold wet raw weather. He did not agree that standards for water repellency might vary, only that the number of end uses might.

Leonard S. Little, a textile consultant and professional engineer in the State of New York, also testified on behalf of defendant. This witness has been continuously engaged in the textile field, particularly in the finishing and testing areas since his graduation from Brown University in 1907. He is a member of several trade and professional organizations relating to the textile industry, and test procedures for determining color fastness, shrinkage, water repellency, and the effectiveness of other finishing processes. As a member of the research committee of the American Association of Textile Chemists and Colorists, he is especially familiar with waterproofing test procedures, and has used the spray test, the hydrostatic test, the rain test, and the drip penetration test. He has also tested garments in the Army quartermaster rainroom. Of these, he stated, the Raintester, hydrostatic tester, and drip penetration tester are useful for the purpose of determining resistance to the penetration of water; the hydrostatic tester and the drip penetration test will indicate whether or not a fabric is waterproof, which quality, as applied to fabrics, this witness defined in terms of being impervious or impermeable to water, and having the capacity to withstand a pressure of 50 centimeters of water for 1 hour. The test for water repellency would be the Raintester, which would reveal whether a fabric was shower resistant, light rain resistant, or rain resistant, none of which qualities would be considered by this witness to be waterproof. All of these tests are performed to determine the classification of fabrics in terms of end use.

Mr. Little had a test of the instant fabric run under his supervision at the Better Fabrics Testing Unit, using the Suter Hydrostatic Tester, and found, as indicated in his report (defendant's exhibit B), that it leaked almost immediately. After the pressure was turned down, the reading was 12.5 centimeters. He, therefore, concluded that it would not meet the standard for waterproofness of 50 centimeters for 1 hour without leakage.

It was the opinion of this witness that the cup test is not a standard test in the trade, and he had never heard it discussed in the measurement of water resistance. He further stated that the textile trade first began to develop water repellency tests in 1929, but the first hydrostatic test procedure was not approved until 1942.

Defendant called as its last witness George A. Slowinske, a chemical engineer employed in the technical laboratory of Du Pont & Co. There, he is engaged in testing various products, including water repellents, produced by the company's dye and chemical division, to determine quality, effectiveness, and potentialities for ultimate use. He also investigates customer complaints.

This witness is a member of several professional societies and has written articles on the subject of the water resistance and water repellency of textile fabrics. As chairman of the Committee on Water Resistance of Fabrics of the American Association of Textile Chemists and Colorists, he has helped to develop test methods for water resistants and water repellents for fabrics, yarns, and fibers, designed to predict their probable end use performance. These include the spray test, static immersion and absorption test, impact penetration test, rain test, and the form of hydrostatic pressure test which is now the standard of the American Association of Textile Chemists and Colorists. It was his view, gleaned from his work on the committee, that there are two general types of test—one to measure the resistance of a yarn to wetting, that is, water repellency, the other to determine water resistance, that is, what water penetration the fabric has. Included in the second group are the hydrostatic pressure test, the rain test, and the impact penetration test. The selection of one test over another depends upon the intended end use. He stated that the American Association of Textile Chemists and Colorists has no present standards for either water repellency, water resistance, or waterproofness. Previous suggested standards, never adopted because the committee felt they were not sufficiently severe, were as follows:

In the hydrostatic pressure test, if the fabric resisted penetration once the pressure was increased to 17 centimeters, it was satisfactory as far as a shower resistance was concerned. If it withstood penetration when it was increased to 50 centimeters, it was satisfactory as far as rain resistance. If it was held at 50 for one hour and then no leakage, then it was called waterproof.

Slowinske did not believe that the cup test was an adequate indication of waterproofness which he defined as imperviousness to water.

Nor had he ever heard of its use in the trade other than by customs officials. He stated that it is possible to determine waterproofness by visual examination, and his inspection of plaintiff's collective exhibit 1 indicated to him that it was not waterproof, for the reason that the pores are open, and do not present an impermeable or continuous wall against water, notwithstanding that the fibers are coated with a chemical. Nevertheless, he was constrained to admit that the products Mystolene and Mystolene R.E.T. were applied to the fabric at bar for the purpose of imparting water repellency or water resistance.

As the foregoing analysis of the evidence suggests, much emphasis has been placed herein, especially by defendant, upon the comparative effectiveness of various methods for testing the reaction of fabrics to water. Indeed, it is the avowed purpose of Government counsel in this case to repudiate as inadequate its own test procedure, and substitute therefor commercial methods and standards of a more exacting nature, upon the theory that "the use to which cloth may be put is determinative of whether or not that cloth is waterproof." Notwithstanding that the cup test has been, for many years, and continues to be, the only means by which cloth is finally identified, for customs purposes, as waterproof, it is urged by the defendant and by *amicus curiae* that the term "waterproof cloth" denotes, not a quality, but an adaptability for prescribed end results. This position derives from the change of practice ruling embodied in T.D. 53630, *supra.*

It is not disputed that, prior to that ruling, cloth of substantially the same quality as the instant cloth has been consistently returned as waterproof cloth. Moreover, it clearly appears from this record that when and if the examiner of any material claimed to be waterproof finds that it falls within the scope of the Treasury decision as being of a kind generally used in the manufacture of articles designed to afford protection against water to the extent expected in the enumerated and similar articles, the ultimate determination of whether or not it shall be so classified by the collector depends upon the outcome of the cup text. In other words, despite the contention that the test is inadequate, it is the only one employed by customs officials and remains their final criterion for resolving the question. Accordingly, it would seem, under the position taken by the defendant, that the test is sufficient for cloth which is generally used in the manufacture of raincoats, protective sheeting, dress shields, umbrella fabrics, or similar articles, but is inadequate for other purposes.

This apparent inconsistency arises from what we consider to be a misplaced emphasis in this case. There is no real question here of whether one test shall be preferred above another. What we are

called upon to determine is whether the cloth at bar is waterproof cloth within the contemplation of paragraph 907, as modified, *supra*.

That issue, plaintiff contends, is resolved favorably to it if it be established that the cloth is substantially impervious to water and is either designed or intended in its manufacture to turn water, *or* is suitable for use in the making of articles designed to repel water.

Waterproof cloth has been provided for, without change material to this controversy, in the last seven tariff statutes. It is a provision which has been the subject of frequent litigation during the course of the many years it has been a part of our tariff structure, and counsel for the respective parties, in well written and exhaustive briefs, have called to our attention most if not all of the leading cases dealing with this perplexing question.

Initially there appears to have been a disposition upon the part of our predecessor, the Board of General Appraisers, to restrict the term "waterproof cloth" to cloth commercially known under that name, commonly used in the making of so-called waterproof garments, and absolutely and durably impervious to water. *In re Mineralized Rubber Co.*, T.D. 12366, G.A. 1138; *In re W. A. Walker*, T.D. 12695, G.A. 1344; *In re C. A. Place*, T.D. 12718, G.A. 1367; and *In re W. A. Walker*, T.D. 12733, G.A. 1382. Several of these early cases were, however, decided without benefit of supporting testimony, but solely on the basis of official papers, inspection of samples, and common knowledge at a time when the board itself was only just developing, and had not yet crystallized its procedures. Later cases have not followed this narrow interpretation.

The case of *United States* v. *Brown*, 136 Fed. 550, T.D. 26124, decided in 1905, constitutes, so far as we have been able to discover, the first appellate court's expression of views with respect to waterproof cloth. In that case, which arose under the Tariff Act of 1890, certain woolen or worsted cloth, known as "cravenette cloth," which had been subjected to a process for making it rain repellent, was claimed and held to be waterproof cloth. It was there established that cravenette cloth was predominantly used as a rainwear fabric, and that it had successfully passed what the court described as a conclusive test, to wit, "One of the witnesses made a bag of the cloth and filled it with water and at the end of 48 hours not only was the water held but the underside of the bag was not even wet." The decision is not of great moment here for the reason that the court's conclusion seems to have turned upon the issue of commercial designation. Nevertheless, the following observations in the case merit consideration..

* * * Cravenette is not absolutely waterproof; in this respect it resembles gossamer rubber cloth and other materials universally recognized as waterproof. Few so-called waterproof cloths are absolutely impervious to water. Practically

and relatively Cravenette is waterproof. It would offer slight protection to a sailor constantly dashed with spray on the deck of a storm-tossed vessel, but it would be a fair substitute for an umbrella and would keep the wearer dry in an ordinary shower of rain. Many so-called fireproof buildings disappeared in the conflagration which recently swept over Baltimore and it is probably true that cravenette cloth would furnish inadequate protection in an unusually severe downpour of rain. Nevertheless for all ordinary uses it is waterproof and that term is properly used in describing it.

The rule of the *Brown* case, *supra*, to the effect that a cloth need not be absolutely impervious to water to fall within the tariff provision for waterproof cloth, was applied in the case of *Bauer & Black* v. *United States*, Abstract 25485, 20 Treas. Dec. 928, in respect to so-called "Jaconette proof sheeting" shown to be principally used for surgical dressings to protect wounds when washing, and for children's beds.

The case of *United States* v. *Hudson Forwarding & Shipping Co.*, 18 C.C.P.A. (Customs) 258, T.D. 44427, likewise rests upon this broader definition. Involved therein was an importation of imitation lizard skin, classified within paragraph 907 of the Tariff Act of 1922 as waterproof cloth, and claimed to be simply filled or coated cotton cloth. This cloth was composed of a cotton fabric coated with cotton fibers or flock, in imitation of lizard skin, and was shown to be limited in use to the trimming of ladies' dresses. No special waterproofing material had been applied to the cloth. It was also established that water poured on the upper surface of the cloth remained overnight without penetrating through the fabric (seemingly the cup test). The trial court found that the cloth was "impervious to water or nearly so" but, nevertheless, not waterproof cloth for the reason that the cloth "is evidently not used or sold for making waterproof garments or to serve any of the purposes of waterproof cloth."

Judgment was affirmed on appeal in a decision which respective counsel acknowledge has an important bearing upon the issue before us. Accordingly, we shall dwell upon it at some length. At the outset, the court observed that not all cloth which is impervious to water is waterproof cloth for tariff purposes. In determining the scope of the provision for waterproof cloth, the court stated:

* * * We do not think that Congress intended that cloth which was not in its manufacture designed to repel or turn water in use, or cloth that is not suitable for such use, should be included in the term "waterproof cloth" found in said paragraph 907. If, in the manufacture of the cloth, its being rendered impervious to water is merely an incidental result, without any intent or design to make it waterproof for the purpose of repelling or turning water, and it is not suitable for such use, it is, in our opinion not "waterproof cloth" within the meaning of said paragraph.

After adverting to various comments on waterproof cloth in the 1921 Summary of Tariff Information, and the Dictionary of Tariff Information, published by the United States Tariff Commission, the court stated:

We therefore hold that the words "waterproof cloth," as used in paragraph 907, include only cloths which were designed or intended in their manufacture to repel water, *or* which are suitable for use as material for articles designed to repel water. [Italics supplied.]

Further analysis of the decision convinces us that the word "or" italicized, *supra*, was intentionally employed to suggest two definite alternatives, for determining whether cloth is waterproof. In other words, use, or, more precisely, suitability for use, is an element to be considered if the cloth in its manufacture is not designed or intended to turn water, but where cloth is subjected to a waterproofing process with the intention to impart a capacity to repel water, a waterproof potential is not necessarily a requisite. This we perceive is the only satisfactory explanation for the court's subsequent determination that not only did the importer *prima facie* overcome the collector's finding that the cloth was intended and designed in its manufacture to be waterproof, but it also made a *prima facie* case showing that the merchandise in issue was not suitable for use in the manufacture of articles designed to repel water. Both findings, necessarily implicit in the collector's return, had to be rebutted for the importer to prevail.

In the case of *United States* v. *E. Dillingham, Inc.*, 19 C.C.P.A. (Customs) 210, T.D. 45297, the court expressly held that the term "waterproof cloth" includes not only cloth impervious to water, but as well cloth *"substantially* impervious to water and intended to repel or turn water or suitable for use as material for articles designed to repel or turn water." [Italics quoted.] The collector's classification of the involved cloth as waterproof presupposed one or more of these alternatives, and the failure of the importer to negate all was fatal to its case.

In *United States* v. *Western Commercial Co.*, 20 C.C.P.A. (Customs) 239, T.D. 46040, it affirmatively appeared that the involved cotton cloth, classified as waterproof cloth, had not been specially treated to render it impervious to water. Based upon evidence that the cloth had withstood both the cup test and the drip test, the court stated:

It has been established by the Government that the imported cloth is substantially impervious to water. It is true that it has not been treated with any waterproofing material, and that its waterproof character is entirely due to the fact that it is a closely woven fabric. However, it is clear from the legislative history, referred to in the *Hudson Forwarding & Shipping Co.* and *E. Dillingham* (*Inc.*) cases, *supra*, that the Congress did not intend to limit the provisions for waterproof cloth in paragraph 907 to such cloth as had been specially treated with waterproofing material.

Under the circumstance that the cloth was found to possess the capacity to resist water penetration, even though this quality was not intentionally imparted to it in the manufacturing process, the court held that the insufficiency of the evidence to negate commercial

suitability for use as a waterproof fabric constituted a failure to overcome the presumption of correctness of the collector's classification.

The provision for waterproof cloth was again the subject of decision in the case of *C. A. Auffmordt & Co.* v. *United States*, 68 Treas. Dec. 48, T.D. 47792, in connection with an importation of suede cloth, used for the making of children's outerwear and for golf jackets and so classified. Predicated upon a review of legislative history and some of the decisions referred to, *supra*, this court held that the term "waterproof cloth" "is not restricted to cloth that is absolutely impervious to water, but includes cloth that is substantially so and intended to repel water, and includes wearing apparel that is at least showerproof." Under that definition, it was further concluded that the so-called cup and drip tests were proper tests to determine whether the subject cloth was waterproof, and that the hydrostatic test, with its more exacting standards, tended toward circumventing congressional intent to provide for cloth which was not absolutely impervious to water and air.

Both parties appear to agree that the *Auffmordt* case, *supra*, constitutes judicial sanction of the cup test as a proper method for determining the waterproof qualities of imported cloth. However, counsel for the Government and *amicus curiae* contend that the subsequent case of *Ratsey & Lapthorn, Inc.* v. *United States*, 68 Treas. Dec. 313, T.D. 47901, decided less than 3 months thereafter, had a contrary effect. There, an importation of canvas cloth, used for the making of sails and riggings for yachts, was classified as waterproof cloth. It was established that the cloth was not specially treated, but, by reason of the closeness of its weave, it had a tendency, when new, to repel water for a short time. Once wet, it apparently lost that quality. However, a cup test, performed by the Government chemist, revealed that the cloth remained dry after 24 hours.

The court, in overruling the collector's classification, discounted the effects of the cup test as a method of determining imperviousness to water, inasmuch as the Government analyst admitted that he had never previously so tested canvas cloth, and the report did not show whether the cloth itself had become wet or had absorbed water. But we are inclined to the view that the court's decision in favor of the plaintiff stemmed from the dual fact that the cloth was not treated for any waterproof purpose and was not commercially suitable for any waterproof use, and the incidental circumstance that the cloth possessed an initial capacity to resist water penetration for a period of 24 hours was, therefore, and quite properly, disregarded.

Our review of the foregoing authorities convinces us that suitability for use for waterproofing purposes is a material fact only where cloth

has not been subjected to a manufacturing process designed or intended to render it water repellent, but not otherwise. To be sure, the problem in the form presented to us has never previously demanded the attention of the courts. The coincidence of special treatment and waterproof use, or the absence of such treatment and the negativing of, or failure to negative, such use, sums up the facts of the decided cases. Nevertheless, we believe, especially from our construction of the *Hudson Shipping & Forwarding Co.*, case, *supra*, that where a fabric has, in the course of its manufacture, been treated with a waterproofing substance with the intention and purpose of imparting a capacity to repel or turn water, and in fact it possesses that capacity, it is waterproof cloth, notwithstanding the projected use of the cloth. Accordingly, any requirement to the contrary in T.D. 53630, *supra*, is an invalid attempt at legislation on the part of the Secretary of the Treasury. *Corporacion Argentina de Productores de Carnes* v. *United States*, 32 C.C.P.A. (Customs) 175, C.A.D. 304.

In view of the uncontradicted evidence that the cloth at bar has been "waterproofed" with a compound containing elements commonly found in waterproofing agents, the question which remains to be determined is whether it possesses the capacity to repel or turn water. That 400 milliliters of water deposited on its surface will not penetrate the fabric for a period well in excess of 24 hours is an established fact. That it does not resist water penetration to the extent demanded of fabrics generally used in the rainwear trade is also affirmatively established.

It is pertinent to observe, however, that commercial designation is not here claimed, and that the term "waterproof cloth" under its common meaning, as judicially defined, contemplates cloth, not absolutely, but only substantially, impervious to water and designed or intended to repel or turn water. If, as seems clear from the evidence in this record, commercial standards are of such a character as are aimed at achieving a total resistance to water penetration, they have no relevance here.

As long ago as 1905, in the case of *United States* v. *Brown*, *supra*, the capacity of cloth to hold water over a sustained period was recognized as a "conclusive test" of its waterproofness. Substantially that same test has served for upwards of 28 years as the method by which customs officials have ascertained whether imported cloth possesses water repelling characteristics. To repudiate it now, because other tests have been developed to suit commercial interests would be to impose a limitation upon the statutory term "waterproof cloth" not contemplated in its enactment. We must conclude, therefore, that the cup test does, for customs purposes, adequately reveal whether a cloth is substantially impervious to water, and that the

fact that the cloth at bar passed that test, under the circumstances of its having been treated with a waterproofing compound, establishes that it is waterproof cloth within the meaning of paragraph 907, *supra*.

The claim in the protest to that effect is sustained. Judgment will be entered accordingly.