(C.D. 2416)

AMITY FABRICS, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 29, 1963)

*George Bronz* for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Richard E. FitzGibbon* and *James F. O'Hara*, trial attorneys), for the defendant.

*Siegel, Mandell & Davidson* (*David Serko* and *Allan H. Kamnitz* of counsel) as *amici curiae* for the plaintiff.

*Lamb & Lerch* (*David A. Golden* and *John G. Lerch* of counsel) as *amici curiae* for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: On September 15, 1960, there was enacted into law a congressional definition and interpretation of the provision in paragraph 907 of the Tariff Act of 1930, for "waterproof cloth, wholly or in chief value of cotton or other vegetable fiber, whether or not in part of India rubber." This amending statute, section 2, Public Law 86–795, provides as follows:

> In order to insure a correct interpretation of the provision "waterproof cloth" in paragraph 907, Tariff Act of 1930, it is hereby declared that it was and is the true intent and meaning of paragraph 907 to limit the term "waterproof", when applied to cloth, "wholly or in chief value of cotton or other vegetable fiber, whether or not in part of India rubber", to cloths of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas, and similar articles. Even when cloth possesses water repelling characteristics, it is not classifiable as waterproof cloth within the meaning of paragraph 907, Tariff Act of 1930, unless it is of a kind generally used in the manufacture of articles of the class specified in the preceding sentence.

The present action is the first occasion for judicial consideration of the scope and effect of this new language. It arises by way of a protest filed against the collector's assessment of duty at the rate of 22½ per centum ad valorem, on an importation of cotton velveteens, which he classified as twill back velveteens, valued at over $1.11⅛ per square yard, pursuant to the provisions of paragraph 909 of

the Tariff Act of 1930, as modified by the Japanese Protocol to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, supplemented by Presidential notification, 90 Treas. Dec. 280, T.D. 53877. It is the contention of the plaintiff that its merchandise falls within the intendment of the revised provision for waterproof cloth, and that, therefore, it is dutiable at only 11 per centum ad valorem, as provided in said paragraph 907, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, as supplemented by Presidential proclamation, 92 Treas. Dec. 175, T.D. 54399.

The parties have in effect agreed by a stipulation entered into during the course of trial that the subject velveteen was properly classifiable as waterproof cloth, if imported prior to the effective date of Public Law 86–795. The full text of their stipulation reads as follows:

1. The merchandise here involved, corretly described in the invoice as "100% Cotton—Made in Italy First Quality Mammola Twill Back Velveteen 35/36'' Water Repellent," consists of cloth wholly of cotton, and not in any part of india rubber.

2. This cloth passes the "cup test" for waterproofing described in D. H. Grant & Co., Inc. vs. United States, C.D. 2065, C.A.D. 723.

3. It has been the established and uniform practice of the Collectors of Customs to classify such cloth as follows:

a. All entries made prior to January 10, 1955 (the effective date of T.D. 53630) were classified under Paragraph 907.

b. All entries made between January 10, 1955, and November 16, 1959, (the date of the decision of the Court of Customs and Patent Appeals in C.A. [sic] 723), which had been liquidated by the latter date, were initially classified under Paragraph 909, but, following the Court decisions in the Grant case, all such classifications which had been protested were reliquidated or are being reliquidated under Paragraph 907. In cases which had reached this Court, stipulations were entered into that "the merchandise consists of waterproof cotton cloth similar in all material respects to that the subject of" the Grant case, and this Court thereupon sustained the claims to reclassification under Paragraph 907. E.G. Abs. 64381, 64382, 64384, 64385, 66046.

c. All entries made between November 16, 1959 and September 14, 1960, inclusive, and earlier entries which had not been liquidated prior to such Court decisions, were and are being classified under Paragraph 907.

d. All entries made since September 15, 1960, are being classified under Paragraph 909.

It is evident from the foregoing that the primary question raised in this case is whether or not the tariff status of water-repellent velveteen has been affected by the amendment to paragraph 907, contained in Public Law 86–795. For a clearer perspective into the problems involved in arriving at an answer to this question, an analysis of the state of the law prior to September 15, 1960, seems warranted.

"Waterproof cloth" is a term which has appeared without change material to this review in the last seven tariff statutes. It has been the subject of frequent litigation over the years,[1] and by judicial construction its meaning has been developed to embrace such cloth as has the capacity to repel water by reason of special treatment during the course of manufacture or is of a character suitable for use in articles designed to repel water. As stated in *United States* v. *E. Dillingham, Inc.*, 19 CCPA 210, T.D. 45297, the term "waterproof cloth" includes not only cloth impervious to water, but as well cloth "*substantially impervious to water and intended to repel or turn water or suitable for use as material for articles designed to repel or turn water.*" [Italics quoted.]

For upwards of 30 years it was, and has continued to be, the practice of customs officials to employ the so-called "cup test" to ascertain whether imported cloth possesses water-repelling characteristics. Without entering upon any technical discussion of the manner in which the cup test is performed, it is sufficient here to observe merely that it purports to show the capacity of cloth to hold water and resist its penetration for a period of 24 hours.

Until October 12, 1954, cloth to which water-repellent chemicals had been applied and which successfully passed the cup test was regarded as waterproof cloth for tariff purposes, without reference to whether or not it was used, or was intended to be used, in the manufacture of articles designed to repel water. It was the character of such cloth rather than its intended application which controlled its classification. On the date in question, the Bureau of Customs issued the following ruling (T.D. 53630, 89 Treas. Dec. 291) :

(1) *Waterproof cloth*—Cloths of a kind which are not generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrella fabrics, and similar articles, even when such cloths possess water repelling characteristics, are not classifiable as waterproof cloth within the meaning of paragraph 907, Tariff Act of 1930. Insofar as this decision results in the assessment of duty at a rate of duty higher than that which has heretofore been assessed under a uniform practice, it shall be applied only to merchandise entered, or withdrawn from warehouse, for consumption after 90 days from the date of publication of this abstract. Bureau letter to the collector of customs, New York, New York, October 11, 1954.

The case of *D. H. Grant & Co., Inc.* v. *United States*, 42 Cust. Ct. 51, C.D. 2065, affirmed, *United States* v. *D. H. Grant & Co., Inc.*, 47 CCPA 20, C.A.D. 723, arose as a result of the change of practice ruling. It involved an importation of cotton gingham, chemically treated

[1] *United States* v. *Brown*, 136 Fed. 550, T.D. 26124 ; *Bauer & Black* v. *United States*, 20 Treas. Dec. 928, Abstract 25485 ; *United States* v. *Hudson Forwarding & Shipping Co.*, 18 CCPA 258, T.D. 44427 ; *United States* v. *Western Commercial Co.*, 20 CCPA 239, T.D. 46040 ; *C. A. Auffmordt & Co.* v. *United States*, 68 Treas. Dec. 48, T.D. 47792.

to repel water, and capable of resisting water penetration under the prescribed cup test, which, nevertheless, was denied classification as waterproof cloth, apparently for the reason that it was not of a kind generally used in the manufacture of articles designed to afford protection against water in the respects set forth in the Bureau ruling.

Both this court and the Court of Customs and Patent Appeals repudiated the Bureau's attempt to define waterproof cloth in terms of its potential use, and adhered to the view that suitability for use as a waterproofing material was not a controlling factor, where it was shown that a cloth had been designedly rendered impervious to water during the course of manufacture. It was further held that the cup test was an adequate and proper test for determining water repellency.

There was no attempt in the *Grant* case to establish that the subject gingham cloth was suitable for use for protective purposes, or had ever been applied to any such use, and our appellate court specifically rejected the proposition that such considerations were relevant, stating:

* * * In view of this court's determination of the meaning of waterproof cloth in previous cases, we believe the Government's contention that the use of the cloth is determinative of whether that cloth is waterproof, is untenable.

As the stipulation of the parties in the instant case reveals, subsequent importations of cotton fabrics, chemically treated with a water repellent, and passing the cup test, were again classified as waterproof cloth, without regard to ultimate use, until the enactment of Public Law 86–795. The principle of the *Grant* case was held to embrace waterproofed cotton velveteens, and, specifically, by direction of the Bureau of Customs, on August 19, 1960, T.D. 55207(7), 95 Treas. Dec. 393, cotton cloth suitable for the making of typewriter ribbon, treated with a water repellent and capable of passing the cup test.

The velveteens at bar were entered after the effective date of Public Law 86–795, and liquidated on January 18, 1961, the provisions of paragraph 909, as modified, *supra*, being held applicable. On May 23, 1961, the Commissioner of Customs issued the following directive to collectors of customs and others concerned (T.D. 55390, 96 Treas. Dec. 189):

*Waterproof cloth—Velveteen, corduroy, and other cotton fabrics*

Certain cotton fabrics, such as velveteen, corduroy, and other fabrics specified by name in Schedule 9 of the Tariff Act of 1930, even though meeting the "cup test," are not covered by Section 2, Public Law 86–795, which clarifies the term "waterproof cloth" as used in paragraph 907, Tariff Act of 1930.

    *       *       *       *       *       *       *

Section 2, P.L. 86–795, approved September 15, 1960, published in T.D. 55239, clarifies the meaning of the term "waterproof cloth" as used in paragraph 907, Tariff Act of 1930.

That law does not cover fabrics such as velveteen, corduroy, and other cotton fabrics which are eo nomine provided for, even though they pass the "cup test" described in footnote 3 to *United States* v. *D. H. Grant & Co., Inc.* (1959), C.A.D. 723, 95 Treas. Dec. (No. 2) 45. Velveteen and corduroy and other cotton fabrics eo nomine provided for, entered, or withdrawn from warehouse, for consumption prior to September 15, 1960, shall be classified in accordance with the decision in C.A.D. 723. The tariff treatment of velveteen, corduroy, and other cotton fabrics eo nomine provided for, entered, or withdrawn from warehouse, for consumption on or after September 15, 1960, shall be as follows: a) So long as the imported fabrics are commonly and commercially known as velveteen, corduroy, etc., even though they have been treated so as to pass the "cup test," they are not classifiable as waterproof cloth under paragraph 907, but are classifiable under paragraph 909 or other appropriate paragraph. b) The tariff classification of any cotton fabric which may have been treated to the extent that it is definitely, generally, and uniformly known in the trade and commerce of the United States as waterproof cloth and not as velveteen, corduroy, etc., will be decided upon presentation of the facts.

It is evident that the Commissioner's directive of May 23, 1961, was not authority for liquidation of the entry at bar, since it was promulgated several months thereafter. Nevertheless, the parties have, to some extent, assumed that it states the case for the collector's action. Whether it does or not need not here be determined, in view of the presumption attaching to the collector's decision that he has found every fact essential to his return. *F. H. Kaysing* v. *United States*, 49 CCPA 69, C.A.D. 798; *United States* v. *John A. Steer Co.*, 46 CCPA 132, C.A.D. 715.

Under the presently controlling definition of "waterproof cloth," and in view of the former practice obtaining for the classification of waterproofed velveteens, it must be presumed that the collector's action resulted from a finding that the subject velveteens were not "cloths of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas, and similar articles," but that they were, in fact, twill back velveteens wholly or in chief value of cotton.

To state the elements entering into the collector's decision in the language Congress has used to provide a "correct interpretation" for the tariff term "waterproof cloth" is not, however, to explain the meaning which should be attributed to the phraseology in question. Not only is the definition itself new, but it is expressed in terms not usually found in tariff statutes, and does not so plainly indicate, as Congress seems to have desired, the meaning which it intended. The terminology is not so distinct as to be susceptible of certain and definite understanding. Indeed, it is here urged by *amici curiae* supporting the position taken by plaintiff that the instant merchandise is waterproof cloth, that the amending statute is so vague and indefinite as

to fail to set forth an intelligible standard, and that, therefore, it is an unconstitutional law. To this argument, appropriate comment will be addressed later on in this opinion. At this point, it suffices to say that the statute is sufficiently ambiguous and uncertain of meaning to warrant consideration of the legislative purpose in its enactment.

Where the language of a statute is ambiguous, it is proper to consider the conditions with reference to the subject-matter that existed when it was adopted, the occasion and necessity for the law, and the causes which induced its enactment, or, in other words, the mischief sought to be avoided and the remedy intended to be afforded. [*In re Di Torio*, 8 F. 2d 279.]

Moreover, under settled law, it is the intent of Congress which governs the interpretation of tariff statutes and "[w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.' " *United States* v. *American Trucking Association*, 310 U.S. 534.

The history of the legislation which became section 2 of Public Law 86–795 [2] plainly shows that its primary purpose was to afford relief to manufacturers of typewriter ribbon cloth, suffering from the competition of low-priced imports, and even more grievously affected when such fabric was temporarily treated with a water-repellent substance, and subjected to the exceptionally low rate of duty applicable to waterproof cloth.

The burden of the initial stages of the legislation seems to have been borne by Senator Pastore of Rhode Island, whose bill (S. 3828) was introduced in behalf of one of his constituents, a Mr. Gordon Osborne, president and treasurer of the Warwick Mills of West Warwick, R.I., a mill specializing in the production of fine-combed textiles, at least 50 per centum of which consisted of typewriter ribbon cloth. Senator Pastore described the plight of the industry in question and related how its apparently successful attempt to obtain an upward revision of the duties on unfinished typewriter ribbon cloth had been thwarted by the classification of such fabric, when passing the cup test, as waterproof cloth. The Senator remarked upon the incongruity of the situation in the case of typewriter ribbon cloth, which in use was required to be absorbent, rather than repellent, and pointed out that, after importation, the waterproof material (a starch of some sort) had to be washed out of the cloth before it could be used for its intended purpose.

What Senator Pastore sought to accomplish was to eliminate a loophole which permitted foreign manufacturers to circumvent the true intent and purpose of the law, by a temporary waterproofing

---

[2] Congressional Record, 86th Congress, 2d session, vol. 106, part 9, p. 11395; part 12, pp. 16019–16022; part 13, pp. 17743, 17856; part 14, pp. 18531, 18755–18757.

treatment having no useful application after importation. It was not his intention to deny the designation of "waterproof" to cloths actually intended to be devoted to uses for which the waterproofing process subserved some legitimate purpose, as, for example, in the making of tents, or the manufacture of raincoats.

Senator Pastore's bill and a companion bill introduced in the House by Representative Mills (H.R. 12437, May 27, 1960) was referred, respectively, to the Senate Committee on Finance and the House Ways and Means Committee, and were not thereafter called up in Congress. Section 2 of Public Law 86–795 originated in the Senate as an amendment to H.R. 2659, a bill to suspend for a temporary period the imposition of duties on heptanoic acid. Senator Pastore was again the moving figure. He explained that the rider was similar to S. 3828 and that it was designed "to close a loophole in our tariff law which has led to a practice which, in essence, violates the intent and spirit of our reciprocal trade agreements." Although the Senator made reference to the *Grant* case, his discussion of the proposed amendment was confined to the effect of the decision on typewriter ribbon cloth. However, it is clear that what he was attempting to accomplish was to prevent classification of fabrics as waterproof cloth, merely because they passed the cup test, if they were not also to be used for "water repellent reasons."

The Senate adopted the amendment, as proposed, and the House conferees agreed to its provisions. After the conference report was read to the members of the House, the question of the effect of the amendment on velveteen fabrics was raised by Representative Fulton in the following interchange (Cong. Record, vol. 106, part 14, 86th Cong., 2d session, pp. 18755–18757):

MR. FULTON. Has there been added to this conference report on heptanoic acid anything in regard to velveteen imports?

MR. MILLS. What this amendment has to do is a redetermination by law of what we mean by waterproof material. We are amending section 907 of the Tariff Act to make certain that only materials that are actually used here for waterproof purposes will come within the purview of that particular paragraph of the Tariff Act. There is a voluntary quota on the amount of velveteen that is shipped into the United States. This would not have anything to do with the quantity of velveteen that would come in.

MR. FULTON. So that then this conference report does not contain the amendment of the Senator from Rhode Island?

MR. MILLS. Yes; it contains that amendment as agreed to in conference.

MR. FULTON. That keeps velveteen from being considered as waterproof.

MR. MILLS. No. It does not prohibit the importation of velveteen. This has to do only with the avoidance of duties. It does provide for velveteen to come in under the paragraph of the Tariff Act fixing the duty on velveteen if the waterproofing question is not involved.

MR. FULTON. Then, I must object.

MR. MILLS. Of course, paragraph 907 fixes the duty on waterproof material.

MR. FULTON. Then, I must object.

MR. MILLS. Well, there is no question of objecting. The question is on the passage or the adoption of the conference report by a majority vote.

*      *      *      *      *      *      *

MR. MILLS. Mr. Speaker, I was in process of explaining that this is an amendment adopted in the Senate, I believe by unanimous approval, to a bill that passed the House by unanimous consent.

The Senate amendment endeavors to correct an interpretation of the provision "waterproof cloth" which is contained in paragraph 907 of the Tariff Act of 1930. What we are doing is enacting a regulation of the Treasury Department, Bureau of Customs, with respect to what constitutes waterproof cloth. This matter was recommended to us by the Treasury Department and the Department of Commerce, this being necessary, so we were told, to plug a loophole in the Tariff Act, in order to prevent materials from coming into the United States that are not to be used for waterproof purposes under the waterproof paragraph at a much less tariff duty that they would have to pay if they came through under the proper tariff paragraph. It is that simple.

It has nothing whatsoever to do with the quantity that may come in, but we are determined, as far as the conference committee is concerned, to insure that when things come into the United States from abroad, they must pay the rate of duty prescribed by law and that they should not be permitted to come in in violation of the intention of the law and the interpretation of the law by the Bureau of Customs.

*      *      *      *      *      *      *

MR. FULTON. The question comes up on the type of procedure this is. This is an original bill covering heptanoic acid. Then it goes over to the other body and, late in the evening of Friday, with not many present, there is added an amendment offered by the gentleman from Rhode Island who puts in a provision with respect to velveteen and waterproofing.

MR. MILLS. No. This is not a provision affecting velveteen.

MR. FULTON. It changes the kind of listing on the ordinary waterproof cloth that comes into the country. * * *

MR. MILLS. Let me explain to the gentleman what it does. It has to do with the definition of "waterproofing." If material comes into the United States for the purpose of being used for waterproof purposes, it will continue to come under this paragraph. However, if it is not to be used for that purpose—take gingham that is coming in here as dress material, and not to be used as a waterproof material at all, should it be permitted to enjoy a lesser rate of duty because they can smear something on it and make it possible to be classified as a waterproof cloth, as interpreted by the court? We do not think they should be permitted to make a shambles of provisions of the tariff law, and that the people who import these things into the United States ought to pay what the law requires them to pay and what it is intended they should pay.

There can be little doubt from the foregoing discussion that what Congress endeavored to accomplish by the bill in question was to prevent the classification of cotton fabrics within the provision for waterproof cloth whenever it was apparent that there was no reason for the

waterproofing treatment other than to obtain the benefit of the lower rate of duty. Just as clearly we perceive it to be the intention of the legislature to preserve the status of fabrics designedly rendered waterproof for the *bona fide* use of that protective quality of the cloth. It is evident, as well, that the language employed to achieve these objectives was adapted from the 1954 Bureau ruling, T.D. 53630, *supra*, the subject of consideration in the *Grant* case. While again and again in the course of the legislative process the actual use of fabrics for waterproofing purposes appears to have been the target for which the Congress was aiming, the language which it borrowed from the Treasury Department to redefine the provision for waterproof cloth does not establish actual use as a criterion. It refers to "cloths of a kind *generally used* in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas, and similar articles. Even when cloth possesses water repelling characteristics, it is not classifiable as waterproof cloth within the meaning of paragraph 907, Tariff Act of 1930, unless it is of a kind *generally used* in the manufacture of articles of the class specified in the preceding sentence." [Italics supplied.] Except that we are advised that Congress intended the fabric to be of a kind actually used for a purpose in which the waterproofing treatment has some real significance, we are not provided with any helpful data in the construction of the language in which the definition is expressed.

The phrase "generally used" is not one which has been previously encountered in tariff statutes, although other terms indicative of use are of frequent occurrence. Such expressions as "chief use," "suitable for use," "fit only to be used as," "exclusively used," and "commonly used" are by now words of art in customs parlance, often construed, and having well-known and established meanings. No useful purpose is here served in elaborating upon the construction of all of these phrases in the body of law that has developed over customs litigation. However, it must appear that an area of identity exists between the expressions "commonly used" and "generally used," in view of the definitions [3] of the words "common" and "general," their synonymous connotation, and their mutual concept of relating

---

[3] Webster's New Collegiate Dictionary, 1961 edition—

common, 1. Belonging or pertaining to the community at large; public. 2. Habitual or notorious: as, a *common* thief. 3. Shared similarly by two or more individuals or species or by all the members of a group or kind. 4. Of ordinary occurrence or appearance; familiar. 5. General or prevalent; as, *common* knowledge. * * *

general, 1. Of or pertaining to the whole; not local; as, a *general* election; *general* anesthesia; also, taken as a whole; (the) whole. 2. Pertaining to, affecting, or applicable to, each and all of a class, kind, or order; as, a *general* law. 3. Not limited to a precise import or application; not specific. 4. Of or pertaining to the typical or generic; generic and abstract; not concrete. 5. Pertaining to many persons, cases, or occasions; prevalent. 6. Not special or specialized; as, a *general* store. 7. Not precise or definite; as, *general* comments. * * *

to that which is familiar or prevalent. The two words are so alike in meaning as to suggest that choice of expression rather than difference in intendment has caused the selection of one in place of the other.

In the recent case of *Holdwire, Ltd.* v. *United States*, 49 Cust. Ct. 19, C.D. 2355, this court had occasion to construe the phrase "wire, commonly used for baling hay or other commodities," in connection with an importation of steel tying wire. We there stated:

Furthermore, in view of the statutory language "commonly used," the burden of the plaintiff was not so great as that assumed by a party having to establish chief use. "The fact of chief use is difficult to prove. It ordinarily entails rather exacting evidence of use throughout the United States, and cannot depend upon evidence of use locally." *L. Tobert Co., Inc., and American Shipping Co.* v. *United States*, 28 Cust. Ct. 456, Abstract 56581, affirmed, 41 C.C.P.A. (Customs) 161, C.A.D. 544. Common use implies "only a use which is not infrequent and which is common to everyday observation, but which, nevertheless, may not be the chief use of such an article." *United States* v. *MacNaughton*, 5 Ct. Cust. Appls. 114, T.D. 34166.

The case of *United States* v. *MacNaughton*, to which we adverted, arose under the Tariff Act of 1909, involving an importation of white-oak piles in the rough. This merchandise was classified in paragraph 200 of said act as "round timber used for spars or in building wharves," but was claimed to be provided for in paragraph 712 of said act as round, unmanufactured timber, not specially provided for. Since use, that is to say, chief use, was the ultimate criterion for upholding the collector's action, the question requiring resolution in the case was whether or not the timber in issue was chiefly used for spars or in the building of wharves. The answer to the question was held to depend upon the construction to be given to certain of the testimony in the record, and, in this connection, the court stated:

Does the testimony in this record establish that the chief use of such timbers as these is for the construction of wharves? There is neither evidence nor contention in the record that it is chiefly used for spars. We do not think that the language of the witness fairly considered is of that import which would warrant the assessment of duty provided by paragraph 200. The question was, first, was this timber "ever used in building wharves?" and the answer was "No." Here the witness evidently referred to the identical timber. The next question was, "I mean similar timber," to which he frankly answered, "Yes; at times." Then counsel for the Government asked the question, if this was a *"common* use for it?" to which he answered, "I would say they were *generally* used for building wharves." [Italics quoted.]

Both the definitions of the words "common" and "generally" and the language as used [are] susceptible of two interpretations. A thing may be generally used for a certain purpose where that use is simply a common one or one not uncommon or unfamiliar but which, nevertheless, does not constitute its chief use. In that sense the word "generally" is coextensive with the word "common," and the fact that the witness used the word "generally" in response to a question addressed to "common" use indicates that the witness understood

the terms coextensive and his answer in that sense. He may have meant, and probably did mean, to respond that such was a common—that is, not uncommon—use for such timber. It is a common use, indeed a general use, for bricks in building fireplaces, but it is not their chief use. It is a common use for plate glass to cover desks, but is not the chief use of plate glass. It is a common use for bolts in the building of wharves but not their chief use. In this sense "common" and "generally" bespeak only a use which is not infrequent and which is common to everyday observation, but which, nevertheless, may not be the chief use of such an article. * * *

It is in this sense that we believe the term "generally used" in the reconstructed definition of "waterproof cloth" must be interpreted. In the light of the motivating reasons for the legislation in question, and the frequent assertions on the part of the sponsoring legislators that if the fabric is to be used in the United States for waterproof purposes, it should continue to be classified as waterproof cloth, we are inclined to the view that Congress did not intend to strike from the provision for waterproof cloth any fabric treated with a water repellent which had a commonly recognized use in the manufacture of articles designed to afford protection against the penetration of water.

Under the circumstances, it must be obvious that the standard set by the Commissioner of Customs in T.D. 55390, *supra*, that so long as a fabric is commonly or commercially known as velveteen, for example, it may not be considered as waterproof cloth, whether or not treated with a water repellent, and passing the cup test, is more rigid than that contemplated by the Congress and, hence, not controlling upon the court. Moreover, we are of opinion that it is unrealistic to say that only such cloth as is known in the trade as "waterproof cloth" may find classification in paragraph 907, as modified, *supra*. We may, we think, observe, as matter of common knowledge, not contingent upon proof, that the phrase "waterproof cloth," alone, would be meaningless in trade and commerce. A manufacturer of a raincoat, or of protective sheeting, or of dress shields, or of umbrellas, would not be likely to place an order under so general a description.

Accepting, as we do, that definition of "generally used" which connotes a use that is commonplace, or not infrequent, it remains to be seen whether the evidence of record in this case suffices to establish such a use for the instant velveteen which, concededly, has been treated with a waterproofing solution and meets the recognized test for determining its repellency.

Eight witnesses were called to testify in this case, and some 22 exhibits were introduced into evidence, all on behalf of plaintiff. No evidence was offered by the defendant.

Plaintiff's first witness was Mr. Don Schreiber, a "department and buying manager" for the John Shillito Co., one of the larger retail department stores in Cincinnati, Ohio. This witness was a buyer

of ladies' suits, coats, and rainwear, and had been purchasing raincoats for the past 2 years. Most of his purchases were made in New York of garments manufactured there. Some were, however, obtained from salesmen operating out of Chicago, Milwaukee, and Tennessee, and at least some of the rainwear he purchased was manufactured in other states than New York. While he did not profess to be able to distinguish between velvet and velveteen, he stated that he was familiar with market offerings of all velveteen raincoats, although he had not purchased any. He described as the most common raincoat on the market today the so-called Chesterfield coat, which is characterized by a 2-inch notched collar of velveteen, set-in sleeves, and a shirtwaist-type front, sometimes also with velveteen-trimmed pockets. He had purchased many such raincoats, also velveteen rainhats, although more of his purchases were of raincoats not trimmed with velveteen. It was his opinion that for a garment to be a satisfactory raincoat, all parts exposed to the weather would have to be water repellent, and the same would be true of rainhats.

Mr. Lionel Wantoch testified in behalf of plaintiff that he is a resident buyer for the Murray Martin Co., which represents over 150 clients located throughout the country, particularly in the States of New York, Connecticut, Rhode Island, Massachusetts, Pennsylvania, New Jersey, Maryland, Virginia, North Carolina, Tennessee, Georgia, Alabama, Louisiana, Texas, Oklahoma, Missouri, New Mexico, Colorado, Illinois, Michigan, Wisconsin, Ohio, Kentucky, California, and in the District of Columbia. Mr. Wantoch is the buyer of raincoats, car coats, and better coats and suits for these customers, and has been buying raincoats for the past 10 years. Most of his purchases are made in New York, but not all of the garments are manufactured there. For at least 5 of the 10 years he has been a buyer or assistant buyer, Mr. Wantoch has purchased less than 100 raincoats made entirely of a fabric he ordered as velveteen. However, throughout his experience, he has also bought many raincoats made partly of velveteen and known as the Chesterfield style. These have had velveteen only on the collar. He has purchased about 5,000 of such coats in the last 2 years.

This witness did not hold himself out as an expert on the distinction between velvet and velveteen, but he believed that he could tell the difference between the two, and that velveteen would be a high-luster, short-napped fabric made of cotton. He further stated that an all-velveteen raincoat would range in wholesale price between $19.75 and perhaps $70, whereas Chesterfields would range in price from $5.75 to $8.75.

Plaintiff's witness Mr. Fred Dachs has been a manufacturer of ladies' raincoats and car coats, under the name of Rainchecks, since

1957. Although he is not a textile expert, he has used a fabric which he believes to be velveteen in the manufacture of Chesterfield-type raincoats, mostly for collars, occasionally for pocket trim or buttons. This fabric has been ordered and billed as waterproof velveteen; and he stated that it would not be possible to produce a satisfactory raincoat, unless the velveteen were water repellent.

Mr. Dachs' merchandise is sold to resident buying offices in New York, to department stores, and to customers in about 45 states, at least 10 of which have customers ordering Chesterfields. He is familiar with competitive offerings of Chesterfield raincoats, and is aware of the fact that full-velveteen coats are marketed. He characterized the Chesterfield as a very popular coat, which he has produced in many fabrics, all with velveteen collars, and which represents 20 to 25 per centum of his entire sale for the past year. In the manufacture of Chesterfield coats, he makes 15 collars out of a yard of velveteen, and uses about 4 by 7 inches of the fabric for each pocket. He does not know of any waterproof or water-repellent velvet on the market, but, in any event, it would be too expensive to be used to trim his coats.

Plaintiff's next witness, Mr. Monte Timoner, is a salesman for Rainchecks of New York, and has been with that company for 2 years. He has sold rainwear for other companies for about 5 years, and has also been a manufacturer of rainwear. He stated that he is familiar with all the bigger department stores that sell rainwear throughout the country, and has, during the course of his experience as a rainwear salesman, traveled to about 25 states. He has sold to department stores, discount stores, chainstores, and specialty stores. He is familiar with offerings of raincoats made entirely of velveteen, which he characterized as "better rainwear" selling at $12.75 and higher, but such coats are not offered for sale by his company. Rainchecks makes raincoats partly of velveteen, known as the Chesterfield type, which he stated "is about the hottest style in the budget and lower end rainwear market today, and for the past two years." That is to say, a customer ordering 300 raincoats would be apt to buy 80 to 100 Chesterfields.

This witness testified that, in the past 2 years, he has sold over 100,000 Chesterfield raincoats to large department stores in New York City; Columbus, Cleveland, and Cincinnati, Ohio; Chicago, Ill.; Philadelphia, Pa.; Baltimore, Md.; Atlanta, Ga.; Miami, Fla.; and Washington, D.C., as well as to the Lerner and Robert Hall chains, which have stores throughout the country. At least 40 to 50 per centum of the initial orders from these outlets were Chesterfield raincoats, in various fabrics, but all velveteen trimmed, either the collar alone, or also the pockets, buttons, and piping, and this trimming was

waterproof velveteen. "You can't make a raincoat unless it is all waterproof."

In response to questioning by the court, Mr. Timoner stated that he believed waterproof velveteen could also be used for the making of bags, shoes, and hats, but did not know of any other uses for that fabric.

Mr. Edgar Schoeman was also called to testify on behalf of plaintiff. He is a buyer for the Atlas Buying Corp., "a buying office representing approximately one-hundred seventy-five to two hundred stores in various cities throughout the United States." Mr. Schoeman, who has been with the company 5½ years, is a buyer of ladies' wear, rain and car coats. To the best of his recollection, the company's clients' stores are located in New York, Rhode Island, Massachusetts, Connecticut, Ohio, Indiana, Michigan, Tennessee, Georgia, Virginia, Washington State, Texas, Oklahoma, and Illinois, and possibly 30 other states which he could not further identify. Most of the sales of rainwear are made in the Middle West, New York, and New England where, as observed by Judge Lawrence, rainfall is heaviest. Mr. Schoeman bought all-velveteen raincoats in 1958, 1959, and, to a limited extent, in 1961. His total purchases in the last 2 years were between 200 and 300. He has also bought raincoats partly of velveteen, known as the Chesterfield. This is a garment which may be made of many different fabrics, but always has a velveteen collar, sometimes, as well, velveteen buttons, piping, and pocket flaps. This witness stated that the Chesterfield has been the most outstanding style in the raincoat field for the past two seasons—"it is the largest selling individual style in rainwear."

Mr. Hy Sherman, another witness for plaintiff, is in charge of distribution for the Allstate Garment Corp., one of the leading manufacturers of raincoats in New York, in the wholesale price range of from $15 to $32.75. He has been with the company for 15 years, and has handled practically all raincoats shipped by it. The company has shipped raincoats made wholly of velveteen for the past 10 years to purchasers in every state of the Union. It also manufactures and sells part-velveteen raincoats of the Chesterfield style, made of various fabrics, but with collars, possibly flap pockets, buttons, and piping made of velveteen. Over this period, the proportion was possibly 75 per centum Chesterfield raincoats to 25 per centum all-velveteen coats. For the past 3 or 4 years, Chesterfields have been the biggest single style marketed by his company. During the past year, the company has distributed about 4,000 to 5,000 all-velveteen coats, in various colors, to wit, red, blue, brown, purple, black, and green, as well as about 20,000 to 30,000 Chesterfields in different fabrics, trimmed with black, green, red, brown, or purple velveteen.

Some of the waterproof velveteen used by Allstate Garment Corp. was of domestic origin, purchased from the firm of Crompton-Richmond; a good portion was fabric imported from Japan and Italy.

Mr. Robert A. Pierce, an assistant buyer of budget coats and raincoats for Bloomingdale's in New York City, and for its branch stores in New York, Connecticut, and New Jersey, testified that he has been so employed for 2 years. During that time, he has purchased raincoats made entirely of velveteen, as well as raincoats made partly of velveteen, but more of the latter. The all-velveteen coats have been sold by Bloomingdale's at retail prices ranging from $49.95 to $69.95, in shades of red, blue, beige, cognac, green, black, and brown. The part velveteens, which are Chesterfields, range in price from $10.95 to $29.95.

Plaintiff's exhibit 2 is an advertisement published in the New York "Times" of November 15, 1961, which shows an all-velveteen raincoat, available in cognac, black, or green, offered for sale by Bloomingdale's at a price of $49.95.

Mr. Pierce further testified that he purchased all-velveteen raincoats from Capel Rainwear in New York, Lawrence of London (a domestic concern), and Tellshire Rainwear of New York, and that, during the past year, he had bought about 100 full-velveteen coats, a minimum of 2,000 part-velveteen coats, and between 2,000 and 3,000 raincoats, not in part of velveteen. Some of the raincoats which he bought are sold with rainhats, the outer portion of which is entirely of velveteen.

Mr. Bernard Richter, another of plaintiff's witnesses, is sales manager in charge of sales, as well as an officer, of Amity Fabrics, Inc., the plaintiff herein. His testimony shows that the company or its predecessor has been in business for 30 years, and has been handling velveteen, both domestic and imported, since 1947. It has imported velveteen from Germany, Japan, Italy, and from England, but, since 1952 or 1953, it has purchased velveteen exclusively from Cotonificio Cantoni of Italy. This has been waterproofed velveteen so treated, at the time of dyeing, on specific order, and sold in the United States in competition with waterproofed velveteen, imported from Japan, and waterproofed velveteen, manufactured by Crompton-Richmond, the major domestic producer of velveteen.

Mr. Richter produced several exhibits which were received in evidence in behalf of plaintiff. Plaintiff's exhibit 3 is a color chart, which contains all of the colors of velveteen imported by plaintiff from Cantoni and offered for sale in 1961 under the designation water-repellent velveteen. He stated that, in selling waterproofed velveteen, he represents to his customers that it is water repellent and suitable for uses which require a water-repellent fabric. He further stated that his company has made "innumerable dry clean-

ing tests of our velveteen, and after six dry cleanings, the water repellency was there still."

Plaintiff's exhibit 4 is a velveteen coat with accompanying tags, exhibits 5 and 6, which the witness had purchased in the raincoat department of B. Altman & Co., in December 1961, for $70. He was unable to state, from an ocular inspection, whether or not it was water repellent, for the reason that waterproofing does not cause any physical change in appearance. The fabric looks, acts, and feels the same. However, he stated that, by pouring water over the fabric, he could tell whether or not it was waterproof, even though he admitted that this could not be a recognized test for water repellency in the trade and commerce of the United States or for customs purposes. With permission of the court, Mr. Richter poured some water from a cup on this exhibit, and, finding that some of the water rolled off, he concluded that it was waterproof.

Plaintiff's exhibits 7, 8, 9, and 10 and plaintiff's exhibits 11, 12, 13, and 14 are two velveteen coats, with accompanying tags, which were said to be raincoats made from waterproof velveteen sold by plaintiff to the manufacturers of rainwear, and supplied to plaintiff from the stock of those companies. After pouring some water on plaintiff's exhibit 11, the witness concluded that it was water repellent.

Plaintiff's exhibit 16 is a shoe manufactured from plaintiff's Cantoni fabric by La Marquise Footwear Co. and sold under the trade name of "Oomphies," a brand of shoe sold widely in the United States. The same water-pouring experiment on the fabric of plaintiff's exhibit 16 resulted in the conclusion that it is water repellent.

Plaintiff's exhibit 17 is a handbag, stated to be made from plaintiff's Cantoni water-repellent velveteen, which, when similarly tested, was said to be water repellent. Exhibit 18, a tag attached to the handbag, was supplied to the manufacturer for distribution with the bag. It states, *inter alia*, that it is water-repellent Cantoni velveteen.

Plaintiff's exhibit 19 consists of 10 sheets of paper, on which are mounted clippings from magazines and newspapers, identified by place and date of publication, containing advertisements of waterproof or water-repellent velveteen garments, offered for the purpose of showing that waterproof velveteen garments are widely advertised for sale.

Plaintiff's exhibit 22 consists of two pages from Public Bulletin USIDA 7, issued by the United States Department of Commerce, Bureau of Census, showing a listing for statistical purposes of cotton velveteen raincoats.

Mr. Richter further stated that he has been engaged in selling activities for Amity Fabrics for a period of 15 years, during which time he has become familiar with the fabrics handled by the company,

114

their qualities, and uses. He has also seen the water repellency process applied in Italy. It consists of treating the fabric with a resin having a silicone base, during the dyeing stage of manufacture. As a result of this treatment, the fabric becomes denser, stiffer, and boardier to the touch, and loses a good portion of its draping qualities. In certain uses, this type of fabric is too bulky and unmanageable to be suitable. It would not be a desirable material for making cocktail, party-type, or bridal dresses. It would be useful and advantageous for such articles as were introduced in evidence—bags, shoes, raincoats, casual coats—as well as for iceskating costumes, ski outfits, parkas with hoods, leggings for children, and rainhats. For this group of uses, it is essential that water repellence be a feature of the material. Cantoni velveteen offered for sale by plaintiff is a heavyweight twill-back velveteen, particularly desirable for outdoor uses.

This witness also testified that he can distinguish between velvet and velveteen; that he has purchased cotton velvet represented to be waterproof, but that it could not pass the cup test; and that he did not know of any waterproofed cotton velvet on the market.

During the year 1961, Amity Fabrics, Inc., imported 1,250,000 yards of water-repellent velveteen, of which 125,000 yards were sold to manufacturers of raincoats, 175,000 yards to manufacturing trades requiring water-repellent velveteen, approximately 50,000 to 75,000 to manufacturers of indoor lounging slacks, 150,000 to 200,000 yards to jobbers of fabrics, and the remainder to fabric shops, specialty shops, and the fabric departments of stores for sale by the yard to consumers. The end uses of velveteen sold to jobbers and retail establishments were not known. Some 25 to 35 different colors of waterproof velveteen are sold to rainwear manufacturers for use in making raincoats. Only about five or six colors of velveteen are used to trim Chesterfields. Amity Febrics, Inc., has sold water-repellent velveteen to manufacturers in California, Florida, Georgia, Kansas, Massachusetts, Missouri, New Hampshire, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Texas, Washington, and Wisconsin, of which California, Missouri, Kansas, Tennessee, and New York are the principal states in which ladies' rainwear is manufactured. Most of the fabric it sold to the rainwear trade was manufactured into full raincoats or all-weather coats.

As we have already indicated, the testimony introduced by the plaintiff has not been rebutted by any evidence submitted by the defendant. Seemingly, therefore, it suffices to present a *prima facie* showing that waterproofed cotton velveteen has a substantial actual use in the manufacture of articles, such as raincoats, designed to afford protection against water penetration. At the very least, there has been established a meaningful reason for subjecting velveteen

to a waterproofing treatment other than a mere purpose to take advantage of the lower rate of duty applicable to waterproof cloth. But there is more in this record. Tending to corroborate the use of waterproofed velveteen in areas where its water-repellent quality is essential are the uncontroverted facts that Cantoni velveteen, treated with a waterproofing solution, has been drycleaned as many as six times without losing its protection against water penetration; that the application of the solution, in the dyeing process, effects some changes in the character of the cloth—makes it denser, stiffer, and boardier to the touch, and less easily draped, and, hence, not well suited for dresswear—that raincoats made of velveteen are offered for sale in retail markets as practical rainwear; that the major domestic producer of velveteen sells a competitive waterproofed velveteen; that large quantities (approximately 70,000 yards in 1961) of the imported fabric, which had been waterproofed, were sold to manufacturers of rainwear, at least two of which concentrate on the manufacture of all-velveteen raincoats; and that waterproofed velveteen has a widespread use in the manufacture of the so-called Chesterfield raincoats, for which use it is necessary that the velveteen be water repellent.

So far as the present record has been developed, this is no fabric which has been temporarily treated with a repellent to take advantage of what Congress has characterized as a loophole in the law. This is a fabric designedly rendered waterproof for ultimate use as a protection against water penetration, in the manufacture of a variety of outerwear in which water repellency is essential, and actually so used in sufficient quantity to support a finding that it is generally used in the manufacture of such garments.

We need not dwell here upon the arguments advanced by *amici curiae* appearing in support of the defendant's position that the instant fabric does not possess the degree of water resistance required in rainwear, for the new definition of waterproof cloth does not change existing law in the respect that waterproofing is not required to impart a total imperviousness to water, but is sufficient if it renders the fabric water repellent or capable of turning water. Moreover, the language of Public Law 86–795 itself permits of the inference that water repellency is an adequate criterion of the quality of being waterproofed, although no longer to be considered sufficient for classification in paragraph 907, "*unless* it is of a kind generally used in the manufacture of articles of the class specified in the preceding sentence." [Italics supplied.]

Neither is it necessary, in view of our conclusion that the instant cloth is "of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats," to consider plaintiff's contention that T.D

55390, *supra*, constituted a change of established practice without the requisite notice provided for in section 315(d) of the Tariff Act of 1930, as amended. It may be observed, however, that the Bureau ruling in question purports to implement the change in the law effected by the new definition of "waterproof cloth," and, hence, is not subject to the provisions of said section 315(d).

We come now to consideration of the argument most vehemently urged by *amici curiae* appearing in support of plaintiff's position that the new definition of waterproof cloth is unconstitutional for vagueness and uncertainty.

It is, of course, an established canon of statutory construction that if an act is so vague and uncertain as to fail to provide an intelligible principle under which men of reasonable understanding may determine their course of conduct, it lacks that degree of definiteness essential to a valid law. *Connally, Commissioner, et al.* v. *General Construction Company*, 269 U.S. 385; *Cramp* v. *Board of Public Instruction of Orange County*, 368 U.S. 278. But there is also a strong presumption in favor of the constitutionality of a duly enacted statute, and an act within the legislative power, resulting from the mature deliberations of the legislative body, must be sustained if ground can possibly be found to do so. *United States* v. *Five Gambling Devices, etc.*, 346 U.S. 441.

The English language itself is not so perfect an instrument of expression as always to convey, with precision and clarity, the exact shade of meaning which the legislature has intended. As a consequence, cases are legion which involve the construction of statutory language found to be ambiguous or indefinite or uncertain, but, nevertheless, not so lacking in intelligibility as to be inoperative. Where there are available aids for the construction of the legislative terminology so as to reveal the intent and meaning of the law; where the legislature has employed words of common use, or which have previously been judicially construed, or are readily understood in the field in which they are expected to apply, the statute containing them may not be struck down for vagueness. *Sproles et al.* v. *Benford*, 286 U.S. 374; *People of the State of New York* v. *Mancuso*, 255 N.Y. 463; *United States* v. *1,010.8 Acres, etc.*, 56 F. Supp. 120; Corpus Juris Secundum, volume 82, section 68, pages 113, 114. Especially is this true in customs jurisprudence, where the ascertainment of the legislative intent, through extraneous data, proceedings in the legislature, tariff history, judicial precedent, and common and commercial meanings, is a well-settled practice. *Sears, Roebuck & Co.* v. *United States*, 26 CCPA 161, C.A.D. 11; *Norwegian Nitrogen Products Co.* v. *United States*, 288 U.S. 294; *United States* v. *S. H. Kress & Co.*, 46 CCPA 135, C.A.D. 716.

We believe our analysis of the factors which prompted the legislation here in contention, in the light of previous judicial constructions and the common meanings of those words here claimed to be uncertain, tends to remove any indefiniteness inherent in the somewhat unusual, though by no means unintelligible, choice of words in Public Law 86–795. The statute is both susceptible of reasonable interpretation and capable of sensible administration. It is not so confused or confusing as to deny to importers seeking to invoke its provisions an opportunity to bring their merchandise within the scope of its operations.

Indeed, the instant plaintiff appears not to have been so confounded by the provisions of this law as to have been unable to make out a *prima facie* showing that its waterproofed velveteen cloth was "of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats." Its claim for classification of the subject merchandise as waterproof cloth within the provisions of paragraph 907 of the Tariff Act of 1930, as amended, and as modified, *supra*, and the consequent assessment of duty thereon at the rate of 11 per centum ad valorem, is, upon all the considerations herein expressed, sustained.

Judgment will be entered accordingly.