(C.D. 4007)

SIMS-WORMS, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 27, 1970)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Sheila N. Ziff, Robert T. Richardson* and *John A. Winters*, trial attorneys), for the defendant.

Before RAO, FORD, and NEWMAN, Judges

RAO, Chief Judge: The merchandise involved in this case consists of waterproofed cotton corduroy cloth imported from Japan on September 19, 1960. It was assessed with duty at 50 per centum ad

valorem under paragraph 909 of the Tariff Act of 1930, as cotton corduroy and is claimed to be dutiable at 11 per centum ad valorem under paragraph 907 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, supplemented by Presidential Proclamation No. 3191, 92 Treas. Dec. 175, T.D. 54399, and as amended by Public Law 86–795, sec. 2, 95 Treas. Dec. 450, T.D. 55239 (effective September 15, 1960), as waterproof cloth, wholly or in chief value of cotton.

The pertinent statutory provisions are as follows:

Paragraph 909, Tariff Act of 1930:

Pile fabrics * * *, wholly or in chief value of cotton * * * if corduroys * * *, 50 per centum ad valorem * * *.

Paragraph 907, Tariff Act of 1930, as modified:

| | |
|---|---|
| Waterproof cloth, wholly or in chief value of cotton or other vegetable fiber * * *_____ | 11% ad val. |

Public Law 86–795:

Sec. 2. In order to insure a correct interpretation of the provision "waterproof cloth" in paragraph 907, Tariff Act of 1930, it is hereby declared that it was and is the true intent and meaning of paragraph 907 to limit the term "waterproof", when applied to cloth, "wholly or in chief value of cotton or other vegetable fiber, whether or not in part of India rubber", to cloths of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas, and similar articles. Even when cloth possesses water repelling characteristics, it is not classifiable as waterproof cloth within the meaning of paragraph 907, Tariff Act of 1930, unless it is of a kind generally used in the manufacture of articles of the class specified in the preceding sentence.

Since it has been stipulated that the cotton corduroy cloth at bar has passed the so-called cup test for waterproofing,[1] the sole issue is whether it is "of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas and similar articles."

In *Amity Fabrics, Inc.* v. *United States*, 51 Cust. Ct. 97, C.D. 2416 (1963), the court considered prior judicial interpretation of the term

---

[1] *United States* v. *D. H. Grant & Co., Inc.,* 47 CCPA 20, C.A.D. 723 (1959).

"waterproof cloth" and examined at length the legislative history of Public Law 86–795. It concluded that Congress intended to prevent the classification of cotton fabrics within the waterproof cloth provision where it was apparent that there was no reason for the waterproof treatment other than to obtain the benefit of a lower rate of duty, but that it did not intend to strike from the provision any fabric treated with a water repellent which had a commonly recognized use in the manufacture of articles designed to afford protection against the penetration of water. It held that the term "generally used" in Public Law 86–795 meant a use which was commonplace, not infrequent, or common to everybody's observation. It also pointed out that it could be inferred from the language of the statute that water repellency was an adequate criterion of the quality of being waterproofed, although classification under paragraph 907, as amended, required also that the merchandise be of a kind generally used in the manufacture of the articles enumerated.

The merchandise involved in the *Amity Fabrics* case consisted of cotton velveteen which passed the "cup test". The record established that such velveteen had a substantial actual use in the manufacture of articles designed to afford protection against water penetration; that velveteen raincoats were offered for sale as practical rainwear; that the major domestic producer sold a competitive waterproofed velveteen; that large quantities (approximately 70,000 yards in 1961) of the imported fabric had been sold to manufacturers of rainwear; that it had a widespread use in the manufacture of so-called chesterfield raincoats, on which water repellent velveteen was used as collars and trim; and that waterproofing changed the character of the cloth, making it denser, stiffer, boardier to the touch, less easily draped, and not well suited for dresswear. The court held that the imported merchandise was classifiable as waterproof cloth, stating (p. 115):

> So far as the present record has been developed, this is no fabric which has been temporarily treated with a repellent to take advantage of what Congress has characterized as a loophole in the law. This is a fabric designedly rendered waterproof for ultimate use as a protection against water penetration, in the manufacture of a variety of outerwear in which water repellency is essential, and actually so used in sufficient quantity to support a finding that it is generally used in the manufacture of such garments.

The record in the *Amity Fabrics* case and that in *N. Erlanger Blumgart & Co., Inc.* v. *United States*, 59 Cust. Ct. 121, C.D. 3092 (1967), which involved waterproof cotton suede cloth were incorporated herein. Plaintiff claims that when those records are considered together with the evidence presented in this case, it will appear that plaintiff has established a *prime facie* case that the instant waterproof

corduroy fabric falls within the scope of paragraph 907, as amended by Public Law 86–795. It is defendant's position that the present record does not indicate that any raincoats were made of corduroy, shows that only a relatively minute amount of corduroy was used in car coats and is persuasive that corduroy is not the kind of cloth generally used in raincoats, protective sheeting, dress shields, umbrellas, and similar articles.

We turn then to the record presented. Plaintiff's first witness was William Comisaroff who has been in the garment business for 44 years as designer and pattern maker and manufacturer of ladies' outerwear, mainly coats. He testified that in 1959 to 1961 he manufactured car coats and raincoats including water repellent coats of corduroy and velveteen. Since the inception of water repellency on fabrics in the late 1940's, he had specialized in the production of water repellent garments. With the exception of an evening coat, he had never sold any corduroy outerwear which was not water repellent. He purchased corduroy from Sims-Worms, Inc., the plaintiff herein, in 1960, specifying that it be water repellent, and made it into water repellent raincoats or facsimiles thereof. When he had occasion to buy corduroy that was not water repellent it was sent to processors to be so finished. In 1960, 1961, and 1962, he used about 12,000 to 15,000 yards of water repellent corduroy annually, making 2500 to 3000 car coats and raincoats thereform. They were sold to specialty shops and chain stores, such as Sears Roebuck, in Texas, Oklahoma, Tennessee, California, Oregon, Washington, Utah, and Nevada. He has seen merchandise offered by his competitors in department stores in downtown Los Angeles and testified that such corduroy outerwear was offered as water repellent. In his experience, corduroy rainwear has been a big factor in the marketing of outerwear, since the inception of water repellency.

Plaintiff's second witness was Bernard Worms, an importer of textile fabrics. He has imported pile fabric, such as velveteen, corduroy and cotton suede in dyed and finished form for 18 years and has sold it primarily to garment manufacturers and jobbers. In 1960 he imported a shipment of about 15,000 yards of corduroy fabric in a waterproofed condition for the purpose of supplying it for the manufacture of rainwear affording protection against water and snow. During 1960 his specialty was water repellent pile fabrics, primarily velveteen, and to a minor degree, corduroy. He dealt with coat manufacturers who used his fabrics for making long all-weather coats and car coats, which afford protection against water, snow and humidity. He stated that car coats were of shorter length and could be worn sitting in the rain

at a football or baseball game or could be used in skiing. Thus, there was a utilitarian value in having the garment water resistant.

Mr. Worms explained that corduroy is identified by its bumpy stripes or wales and is made with as many as 26 wales or as few as 4 wales. According to the witness, fine, lightweight corduroy with many wales close together is called pinwale. The water repellent corduroy which he imported was between 16 and 20 wales, which some would call pinwale. One of his customers made an all-weather coat with an attached hood from a pinwale corduroy.

Mr. Worms testified that he has visited manufacturers in New York, Los Angeles, and San Francisco, is familiar with the types of merchandise produced by them, and is acquainted with the total United States market in corduroy and velveteen, although his sales were primarily on the West Coast. He has visited trade shows and is familiar with trade publications. He has seen advertisements of corduroy car coats as rainwear.

He said that the primary use of corduroy in the wearing appeal industry in 1960 was for men's shirts, men's and boy's slacks, and ladies' sport dresses. While he had seen non-water repellent corduroy used in outerwear, such as pants, shirts, and pajamas, he had not seen non-waterproofed all-weather coats or car coats. He testified that in 1960, water resistant car coats and outer coats of velveteen, corduroy, and suede were being sold in the trade and commerce of the United States. The same type of articles were made from all three materials, corduroy being more readily adaptable to all types of car coats, all-weather coats, and jackets, because it comes in more weights.

He testified that rainwear in his understanding includes all garments that afford protection against water, snow, and humidity.

Plaintiff's next witness was Joseph Foreman, manufacturer of rainwear, outerwear, and cat coats since 1947. He is presently engaged in manufacturing under the name of Jet Set of California and has a plant in Utah which produces rain resistant corduroy car coats.

In the years 1957 to 1960 he was with Doumas of California, which firm manufactured wool coats and an all-weather, rain resistant, 4-wale corduroy coat. The fabric was produced by Crompton-Richmond (one of the largest domestic manufacturers) and was processed for water repellency. In 1958 to 1959 the firm purchased 100,000 yards which was made up into all-weather coats, and 30,000 to 40,000 garments were produced which the witness considered a substantial amount. There were also a number of competitors who made the same item. According to the witness, water repellent coats were a big item in the United States market; they were sold as storm coats in various

parts of the country. Invariably, corduroy had to be water repellent to come under the category of an all-weather fabric. A corduroy coat would not be advertised by stores, such as Sears, as an all-weather coat unless it was water repellent.

He said that the term "rainwear" was not restricted to raincoats but included dressy fabrics such as satins and synthetics which were used in dress coats. All-weather coats are considered a category of rainwear in the trade.

He said he was familiar with an advertisement showing a car coat which was processed for all weather.

From 1965 through the present time he has manufactured a non-water repellent corduroy car coat but in 1960 he did not produce corduroy outerwear which was not water repellent.

Plaintiff's next witness was Paul H. Simon, executive vice-president of Geltman Industries, a firm which provides a textile processing service to manufacturers and mills. This includes processing to make fabrics water repellent. During 1960, the company made domestic corduroy water repellent for manufacturers of all-weather coats, ski wear, and rainwear. The witness was reasonably familiar with the corduroy industry on a nationwide basis and said that the percentage of corduroy which his firm processed for water repellency was small. However, in 1960 it had so processed 80,000 to 95,000 yards, as follows:

> Los Angles office – 40,000 to 45,000 yards
> San Francisco office – 10,000 yards
> Portland office – 30,000 to 40,000 yards

Among the manufacturers for whom this work was done were Crompton-Richmond and Cone Mills, the two largest corduroy producers in the country. His firm had water repelled pinwale corduroy, which the witness said was a little easier than processing wide wale as it took less chemicals. He said that there was no essential difference between the durability of water repelled pinwale and water repelled wide wale.

Mr. Simon stated that in 1959 and 1960 all-weather garments were becoming popular, especially on the West Coast. Such coats were designed for streetwear but had to be water repellent so that they could be worn in the rain. Rainwear, in his view, was designed specially for wearing in the rain. He explained that the difference between water proofing and water repelling is that the former makes fabric impervious to water while the latter only makes it water repellent. Water resistant fabric does afford protection against water.

There was testimony that water repellent corduroy coats are higher in price than non-water repellent coats and that the water repellency

process increases the bulkiness, stiffness, and boardiness of the fabric, makes it a little more firm, and adds the weight of the chemical that remains on the fabric.

Defendant's first witness was Sherwin Gaines, western regional manager of Crompton-Richmond Company, manufacturer of corduroys, velveteens, and velvets. His duties include sales supervision, office management, personnel, and visiting customers in the area of California, Nevada, Utah, Arizona and the city of El Paso, Texas. He had sold corduroy to the manufacturers of women's and men's sportswear and outerwear, and as over-the-counter yardage for the home sewer. In 1960 he had sold approximately a million and a half yards in his area. Of this about 10,000 to 20,000 yards were waterproofed. Similar figures were given for 1961 and 1962. To his knowledge, none of the articles made from corduroy which he sold to sportswear customers were offered as designed to protect or afford protection against water. Some of his customers made up car coats from corduroy with the regular finish, but did not offer them to the trade as raincoats. So far as he knew, none of the corduroy which he sold was made up into rainwear. He did not have any rainwear accounts.

He stated that his firm would process fabric for water repellency at an extra cost. Customers who bought water repellent material required it as a merchandising feature. He knew of customers who made all-weather coats from corduroy but stated that the coats did not have to have a certain amount of water repellency. He said that a very small percentage of the car coats manufactured from corduroy which he sells was water repellent.

He did not think it would be easy for someone other than the manufacturer to make corduroy cloth water repellent because it was a very specialized pile fabric and needed a special technique for waterproofing. He admitted, however, that a relatively small amount might be rendered water resistant by processors.

Defendant's second witness was Herb Slater, sales representative of Cone Mills in the Los Angeles area. He testified that Cone Mills is the largest producer of corduroy in the world. He sells all types of corduroy in his area, including water repellent corduroy when requested. His firm is equipped to put on any kind of water repellency that a customer desires, but he could not recall ever selling a piece of water repellent corduroy by design. His customers manufacture children's wear, women's sportswear, men's sportswear, and men's and boys' pants. None of them make corduroy into articles designed to afford protection against water or into rainwear. He had no rainwear accounts. In his view, the term "rainwear" meant a raincoat and not a car coat.

There was testimony in the incorporated records that corduroy was one of the fabrics used in making water repellent garments and that it was used in chesterfield type raincoats.

We conclude that the record herein is sufficient to establish that corduroy is purposely processed for water repellency, both domestically and abroad, and is a fabric generally used in the manufacture of articles designed to afford protection against water penetration. While a larger percentage of corduroy may be used for the production of nonwater repellent garments, it is clear that corduroy has a substantial use in the production of water repellent raincoats, car coats, and all-weather coats. Such coats are water resistant to the extent expected in raincoats and similar articles and are purchased and worn not only for warmth but for protection against rain or snow. Whether or not all car coats are water repellent is immaterial, since, according to the record, many of them have that characteristic as do all-weather corduroy coats. Coats of that kind are and have been for many years common articles of commerce in the United States.

On the record presented and on the authority of *Amity Fabrics, Inc.* v. *United States, supra*, we hold that the waterproofed corduroy fabric involved herein is properly dutiable at 11 per centum ad valorem as waterproof cloth, wholly or in chief value of cotton, within the intendment of paragraph 907 of the Tariff Act of 1930, as modified, supplemented and amended.

The protest is sustained and judgment will be entered for the plaintiff.