(C.D. 4030)

ROHNER, GEHRIG & CO. ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided June 5, 1970)

*Sharretts, Paley, Carter & Blauvelt* (*Gail T. Cumins* of counsel) for the plaintiffs.

*William D. Ruckelshaus*, Assistant Attorney General (*Patrick D. Gill* and *John A. Winters*, trial attorneys), for the defendant.

RAO, Chief Judge: The merchandise involved in these cases, consolidated at the trial, consists of five qualities of cotton suede cloth manufactured in Holland by J. W. Meijerink & Sons and exported to the United States in the years 1960 through 1963. It was classified as cotton cloth, printed, dyed or colored, and assessed with duty at various rates under the countable yarn provisions of paragraph 904(c) of the Tariff Act of 1930, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, 90 Treas. Dec. 234, T.D. 53865, supplemented by President's notification of August 22, 1955, 90 Treas. Dec. 280, T.D. 53877. It is claimed to be dutiable at 11 per centum ad valorem under paragraph 907 of said tariff act, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T.D. 51802, and by Presidential Proclamation No. 3191, 92 Treas. Dec. 175, T.D. 54399, and as amended by Public Law 86-795, section 2, 74 Stat. 1051, as waterproof cloth, wholly or in chief value of cotton or other vegetable fibers.

The pertinent provisions of the tariff act are as follows:

Paragraph 904(c), as modified:

> Cotton cloth, printed, dyed, or colored, of average yarn number—
> Not over 60 and valued not over 90 cents per pound, or over 60 but not over 80 and valued not over $1.40 per pound_____ 12% ad val. and in addition, for each number, 0.25% ad val.

Paragraph 907, as modified:

> Waterproof cloth, wholly or in chief value of cotton or other vegetable fiber * * *_____ 11% ad val.

Public Law 86-795:

> SEC. 2. In order to insure a correct interpretation of the provision "waterproof cloth" in paragraph 907, Tariff Act of 1930, it is hereby declared that it was and is the true intent and meaning of paragraph 907 to limit the term "waterproof", when applied to cloth, "wholly or in chief value of cotton or other vegetable fiber, whether or not in part of India rubber", to cloths of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas, and similar articles. Even when cloth possesses water repelling characteristics, it is not classifiable as waterproof cloth within the meaning of paragraph 907, Tariff Act of 1930, unless it is of a kind generally used in the manufacture of articles of the class specified in the preceding sentence.

The issue in this case is whether the imported merchandise is waterproof cloth within the meaning of paragraph 907, as amended.

The term "waterproof cloth" has appeared in tariff statutes since 1883 and has been the subject of frequent litigation. In *United States* v. *E. Dillingham, Inc.*, 19 CCPA 210, T.D. 45297 (1931), it was held that Congress did not intend the provisions for waterproof cloth to cover only such cloth as was impervious to water but to include cloth substantially impervious to water and intended to repel or turn water. In *United States* v. *D. H. Grant & Co., Inc.*, 47 CCPA 20, 26, C.A.D. 723 (1959), the court held that "if cloth passes the 'cup' test or equivalent tests, it has the property of being 'substantially impervious' to water for tariff purposes." The "cup" test which has been adopted by the Government for at least 28 years was described by the court as follows (p. 23):

> A 15 inch square of cloth is placed over a liter beaker, a pocket or cup is formed in the cloth, avoiding folds if possible, and the periphery of the cloth is fastened by such as rubberbands to the outside of the beaker. Then 0.4 liter of water at room temperature is poured gently into the "cup." If after 24 hours no water appears in the beaker, the fabric is considered to be waterproof. This is the test procedure followed by the Bureau of Customs Laboratories as shown by Exhibit A.

By Public Law 86-795 of September 15, 1960, the term "waterproof cloth" was also limited to apply only to "cloths of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas and similar articles."

Thus, under the statutes applicable in the instant case, plaintiffs must establish that the merchandise has passed the "cup" test or equivalent test and is substantially impervious to water and that it is of a kind generally used in the manufacture of articles designed to afford protection against water to the extent expected in raincoats and similar articles. *Amity Fabrics, Inc.* v. *United States*, 51 Cust. Ct. 97, C.D. 2416 (1963).

On the first point, Mr. H. Camstra, who was technical manager of the Meijerink factory during the years 1960 through 1963, and was responsible for manufacturing all its water repellent suede cloths, testified that such merchandise was always manufactured in the same way, against fixed specifications, and was treated with a product called Mrottalm for water repellency. After manufacture, one or two samples were taken out of every lot of 1100 yards and tested as follows:

> The first test by us was the so-called rain test. For the rain test, we stretched a piece of cloth under a shower in which was an amount of water. The water dropped on the cloth for approxi-

mately ten minutes. It must have been about ten minutes. If the water went through, the lot was rejected, was not up to standard, and we had to rehandle it. The second test was the so-called cup test. That is how it is translated in English, the cup test. Here we had to stretch a piece of cloth over a cup. In that cloth, with the pile side up, came a hundred c.c.'s water. In that case, the water stood somewhat higher than one inch over the cloth. The cloth had to stand out 24 hours in this case. If the water goes through here, the lot was rejected and must also be rehandled.

When any sample did not pass the tests, the lot was retreated. According to the witness all of the suede cloth manufactured by his company and sold to the United States in 1960–63 was treated for water repellency and subjected to both tests before shipment. To the best of his knowledge no suede cloth that did not pass the tests was exported to the United States. The tests were performed in the laboratory and the witness received the test figures from every lot. In his opinion it was not possible that the sample might not be representative of all the merchandise which had been tested.

While the witnesses who had purchased and sold the Meijerink cloth involved herein did not subject it to the cup test or its equivalent, they testified that they had not received complaints from their customers with respect to its water repellency except that one witness had received a complaint from Lanson Rainwear that two or three pieces did not stand their test for water repellency and another said that his firm occasionally might get back a jacket which had been guaranteed for life of the article.

In *Amity Mills, Inc.* v. *United States*, 64 Cust. Ct. 42, C.D. 3957 (1970), the record lacked evidence of the capacity of the fabric to resist water penetration as revealed by any accredited test made before or after importation. There was evidence that the merchandise had been treated with a water repellent solution called Ramasit K.G.T., but the court held it was insufficient to establish that the merchandise, although treated with a waterproofing solution, met the requirements of the cup test.

In the instant case there is uncontradicted evidence that at the time of manufacture the merchandise was subjected to the cup test and that no lots which did not pass were exported. There is nothing to show any change of condition at the time of importation.

We find, therefore, that the imported merchandise meets the first requirement for classification as waterproof cloth, that is, that it pass the cup test or its equivalent.

The next question is whether the merchandise is "of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas, and similar articles."

In *N. Erlanger Blumgart & Co., Inc.* v. *United States*, 59 Cust. Ct. 121, C.D. 3092 (1967), it was held, on the basis of a stipulation entered into after extensive testimony had been introduced, that the cotton suede cloth there involved met the requirements for classification as waterproof cloth. That merchandise weighed 12 or 13 ounces per square yard whereas the suede cloth here involved ranges in weight from 6.6 ounces to 11.05 ounces per square yard. The issue here is whether these lighter weight suede cloths are generally used in the manufacture of raincoats and similar articles designed to afford protection against water penetration.

According to Mr. Fritz H. Pollnow, exclusive representative in this country for the sale of Meijerink products from 1960 through 1963, 3,670,000 yards of Meijerink suede cloth were imported during that period, of which 3,476,611 belonged to the five qualities before the court. His testimony and that of other witnesses indicated that about 62.5 percent thereof was sold to the following concerns:

| | |
|---|---|
| Marshall Ray Company | Morton Karten, Inc. |
| Utica Duxbak Corporation | Kute Kiddy Coats |
| March & Mandel | B. W. Harris Mfg. Co. |
| Lanson Rainwear | Wales Fabrics Corp. |

Witnesses from these firms testified as to the use they made of the material. Two coats manufactured by Marshall Ray Company of cotton suede cloth were received in evidence as illustrative exhibits 6 and 7. Mr. Sol Tandler, buyer and designer of Marshall Ray, testified that exhibit 6 is a man's suede car coat and all-weather coat and that exhibit 7 is a suede all-year-round coat. Exhibit 6 is lined with a synthetic sherpa pile fabric which is not water repellent and exhibit 7 has a zip-out lining. The witness said that his firm makes 28 models of men's outerwear garments which are sold to department store chains and small stores. In addition to cotton suede, his firm uses corduroy, dacrons and cottons, and woolens. All of them are required to be water repellent so that the garments can be used in rain, snow and sleet. The garments are sold and advertised as water repellent. The merchandise purchased from Meijerink was used to make sport coats which could be worn in all kinds of weather and all-weather coats. The material would not have been purchased had it not been water repellent.

The witness stated that he was familiar with outerwear manufactured by his competitors and that he knew that they made all-weather coats using water repellent cotton suede. In his opinion, the use of water repellent cotton suede as represented by plaintiffs' exhibit 1 in the manufacture of all-weather coats is a common use with American manufacturers of outerwear.

Mr. Gilbert H. Jones, president and general manager of Utica Duxbak Corporation, testified that his firm used the 8-ounce P.V.

quality suede cloth purchased from Meijerink for the manufacture of short bird shooting coats, hunting pants, a cap, and an insulated vest, for which purpose his firm required very durable fabrics with a good abrasion quality and water repellency. Had the suede cloth purchased from Meijerink not been water repellent, the firm would have had it treated. This was necessary because the outerwear made by his firm has to be water repellent. The company requires the same degree of protection against water in the garments it makes as it would in raincoats or similar articles.

The witness distinguished waterproofing and water repellency as follows:

> Waterproof is something that is a coating on a fabric which will not leak when water hits it and will never leak until that coating is scraped off or deteriorates. Water-repellency is a solution, chemical solution, that is put on a fabric; that will, because of its nature, repel water and cause the water to bead up, and not soak into the yarns of the fabric and soak through. Eventually, through usage, this chemical is worn off the fabric. In some cases, I would say in a real downpour where somebody stays out in it for sometime, as with a raincoat, for instance, in a real downpour, eventually, if you stay out too long in a hard rain, eventually a water repellent fabric will start to leak. Just the force of the water coming down eventually will penetrate through.

Utica Duxbak sells directly to sporting goods dealers or sporting goods departments, such as, Abercrombie and Fitch, Herman's, or L. L. Bean in Maine. The articles described as hunting jackets, pants, and caps, are sold and advertised as water repellent.

Mr. William Mendel, former executive vice president of March & Mendel, testified that the business of that firm is the manufacture of rainwear and outerwear. By the term "outerwear" he meant a garment that is worn as a protection against cold and rain. His firm used the fabric purchased from Meijerink for the manufacture of raincoats and outerwear, which garments are also called storm toppers or storm coats. The fabric has to be sturdy, show a good test against abrasion, and be water repellent. He testified that his company uses only water repellent fabrics, and that the garments made from Meijerink suede cloth were sold and advertised as water repellent. Such garments differ from raincoats in that they have a heavy lining because they are designed as cold weather garments and also for protection against rain and snow, whereas raincoats are generally lined with a lightweight taffeta which is not a protection against cold. He expects the same degree of water repellency in his outerwear or all-weather coats as he would in raincoats.

He said he had seen outerwear manufactured by his competitors made of water repellent suede cloth. In his opinion such cloth has been

very popular for use in the manufacture of rainwear and outerwear and was commonly so used during the years 1960–1963.

Mr. David Landau, president of Lanson Rainwear, testified that his firm purchased water repellent suede cloth from Meijerink during 1960 to 1963 and used it to make car coats and raincoats, for which the fabrics had to be sturdy, have abrasive qualities, and be water repellent. He would not have purchased the Meijerink suede cloth had it not been water repellent. He expects the same degree of water repellency in his car coats as he does in the raincoats he manufactures.

His firm sells to department stores and specialty shops and sells and advertises its garments as water repellent. All carry a tag which states that they are water repellent. On the basis of his experience, he testified that during the years 1960–63, the use of water repellent suede cloth in the manufacture of raincoats, all-weather coats, and car coats was common.

Mr. Morton K. Karten, who was president of Morton Karten, Inc., during the years 1960 through 1963, testified that he purchased water repellent suede cloth from Meijerink in light, medium, and heavy weights, for manufacture into children's outerwear, such as snowsuits and all-weather coats and ski parkas. Such garments were required to be strong, durable and water repellent, water repellency being a prerequisite in fabrics used for children's outerwear. Had the Meijerink suede cloth not been water repellent, under no condition could or would his firm have used it. The garments made therefrom were sold and advertised as water repellent.

According to the witness, weight was a factor in selecting the fabric only to the degree that it had to be heavy enough to be used. The lightest was used in ski parkas and the heaviest in snowsuits or pants. In his opinion, no one would use less than 7-ounce weight in outerwear because it would not be heavy enough to sustain the abrasiveness required.

Mr. Karten stated that he had seen merchandise manufactured by his competitors from cotton suede in every section of the country, and that in his opinion the use of water repellent cotton suede in the manufacture of raincoats, snowsuits, and all-weather coats was a common general use during the years 1960 through 1963.

Mr. Melvin S. Kahn, production manager and piece goods buyer of Kute Kiddy Coats, testified that his firm had used the P.V. and P.T. type fabric purchased from Meijerink in the manufacture of leggings for children's coats, for which the fabric had to be of sufficient weight and water repellency since children wear them in inclement weather. His firm would not have purchased the material had it not been water repellent. The weights used for leggings were between 6 and 8 ounces. The same degree of water repellency was expected

in the 6-ounce leggings as in the 8-ounce ones. They were sold as water repellent.

Mr. Charles S. Harris, chairman of the board of B. W. Harris Manufacturing Co., testified that his firm had purchased different qualities of cotton suede from Meijerink and had used the 9- and 11-ounce material in the manufacture of outdoor garments for cold weather, and the 6½-ounce material in the spring for a lightweight jacket for walking and golf. Since all of the garments his firm manufactures are used for outdoor purposes, practically all of the fabrics must have a water repellency of some kind. In winter garments a heavier weight was required. His firm started with a 9-ounce weight and found later on that the 11-ounce would serve better. The same degree of water repellency was in the lightweight as in the heaviest weight fabric.

Mr. Arthur D. Steinberg, president of Wales Fabric Corporation, testified that during 1960 through 1963 his firm purchased water repellent cotton suede cloth manufactured by Meijerink and sold it to manufacturers of car coats, all-weather coats or storm coats. To his knowledge, 600,000 to 700,000 yards of the suede cloth sold by his firm were used in the manufacture of all-weather coats. The remainder went into dresses and vests or was sold as fabric to retail stores. His purchasers required that the merchandise be water repellent because the garments were to be used in bad weather. The goods were never offered without water repellence. The degree of water repellency is similar in raincoats and in snow coats. In his opinion, water repellent fabric can be worn in the rain without penetration for a certain period of time.

Defendant called Mr. Richard Allan Glass, who had been associated with Cone Mills Corporation, textile manufacturer, for 4 years but had had no experience with the use of water repellent cotton suedes in the United States during the years 1960 through 1963. He testified on the basis of conversations with customers and salesmen that his firm's cotton suedes were used in the manufacture of general sportswear and outerwear, and that in a very few cases, customers requested water repellent finishes for 8½-ounce cotton suedes used for outerwear to prevent water from penetrating the garment. He had no personal experience in selling lightweight cotton suedes to the rainwear industry. In his opinion, the suede cloths involved herein were of a kind which could have a water repellent finish for use in outerwear but most of this type of cloth would not be water repellent and would be used in making sportswear.

Defendant's second witness was Mr. William J. Roche, sales manager of the raincoat and outerwear division of J. P. Stevens Company,

textile manufacturer. He testified that his firm did not manufacture cotton suedes of the type involved here but only the 4-ounce weight which was used for pajamas. He never sold any cotton suedes to manufacturers of rainwear and had no direct personal experience with water repellent cotton suede cloth within the past 10 years. He had never seen cloths such as those involved herein used in the manufacture of raincoats, but had seen them used in outerwear jackets, such as exhibits 6 and 7. In his opinion they did not belong to the class of articles which are designed to offer protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas, and similar articles. His definition of an outer jacket or coat is one that has a sewn-in lining and is used for protection against cold, wind, rain and snow. His firm manufactures water repellent fabrics that are used in the outerwear trade, such as twill fabrics and poplin fabrics. They are offered as water repellent. Rainwear manufacturers will buy cloth that will repel water to a greater degree.

Defendant's next witness was Mr. Irving S. Eskenazi, president of Bryn Mawr Sportswear, manufacturer of ladies' and children's sportswear. He testified that he used cotton suedes when they were fashionable in weights running from 7 ounces to 10 ounces, in the manufacture of skirts, pants, vests, jackets, suits and car coats. Water repellent cotton suedes in these weights were used because water repellence added to the body of the cloth and carried with it a connotation of stain resistance to water. He had never seen suede cloth such as that involved herein used in anything like raincoats or similar articles. In his opinion such cloths are not of a kind that are generally used to afford protection against water. Exhibits 6 and 7 are car coats as distinguished from a raincoat, the former being used to keep the wearer warm whereas the latter is to keep him dry.

Defendant's last witness was Mr. Paul Cohen, merchandising manager department head of Concord Fabrics, Inc. He testified that from 1959 to 1965 or 1966, his firm sold cotton suedes in the 8-ounce per square yard weight. It had sold water repellent cotton suedes on rare occasions never to a rainwear manufacturer, but for use in ladies' sportswear and car coats. In his opinion, cloth of the kind involved herein is not primarily used in the manufacture of articles which are designed to afford protection against water. He said that suede fabric by virtue of its properties and pile, when subjected to water, comes out looking like a dead cat. He stated, however, that the addition of water repellency to cotton suede will enhance the feel of the goods and give it a little more body. From time to time his customers have asked him to treat cotton suede with a water repellent finish. Such material usually went into car coats.

Public Law 86-795, *supra*, which added a "use" requirement for classification of merchandise as waterproof cloth was before the court in *Amity Fabrics, Inc.* v. *United States, supra.* We found that its purpose was to prevent the classification of cotton fabrics as waterproof cloth where it was evident that there was no reason for the water repellent treatment except to obtain the benefit of a lower rate of duty, and to limit coverage to fabric so treated which had a commonly recognized use in the manufacture of articles designed to afford protection against the penetration of water to the extent expected in raincoats and similar articles.

The merchandise involved in that case was cotton velveteen which had passed the cup test. The record established that such velveteen had a substantial actual use in the manufacture of articles designed to afford protection against water penetration; that velveteen raincoats were offered for sale as practical rainwear; that the major domestic producer sold a competitive waterproofed velveteen; that large quantities (approximately 70,000 yards in 1961) of the imported fabric had been sold to manufacturers of rainwear; that it had widespread use in the manufacture of chesterfield raincoats, on which water repellent velveteen was used as collars and trim; and that waterproofing changed the character of the cloth, making it denser, stiffer, boardier to the touch, less easily draped, and not well suited for dresswear. The court held that the merchandise was classifiable as waterproof cloth, stating (p. 115):

> So far as the present record has been developed, this is no fabric which has been temporarily treated with a repellent to take advantage of what Congress has characterized as a loophole in the law. This is a fabric designedly rendered waterproof for ultimate use as a protection against water penetration, in the manufacture of a variety of outerwear in which water repellency is essential, and actually so used in sufficient quantity to support a finding that it is generally used in the manufacture of such garments.

Very recently in *Sims-Worms, Inc.* v. *United States*, 64 Cust. Ct. 392, C.D. 4007 (1970), we held that cotton corduroy fabric which had been treated for water repellency and passed the cup test was classifiable as waterproof cloth on the ground that corduroy is purposely processed for water repellency both domestically and abroad; that the process effects some changes in the character of the fabric; that corduroy has a substantial use in the production of water repellent raincoats, car coats and all-weather coats which are resistant to water penetration and are used as a protection against rain and snow as well as for warmth; and that coats of that kind have been common articles of commerce in the United States for many years. We concluded that

although a larger percentage of corduroy was used for the production of non-water repellent garments, a substantial portion was used in the manufacture of water repellent garments which were water resistant to the extent expected in raincoats and similar articles.

In the instant case the record establishes that substantial quantities of water repellent cotton suede cloth were imported into the United States in 1960 through 1963 and were used in the manufacture of raincoats and outerwear garments such as car coats, all-weather coats, bird shooting coats, hunting pants, children's snowsuits, ski parkas, and leggings. All of these articles were required to be water repellent as they were designed for use in rain and snow to afford protection against water penetration. Such cloth was purposely treated for water repellency and would not have been purchased or used by the manufacturers if it had not been water resistant. Although various weights of fabric are involved herein, the evidence indicates that each has the same degree of water repellency and that each is used in garments designed to afford protection against water to the extent expected in raincoats and similar articles. According to the record, water repellent suede cloth has been commonly used in the United States for the manufacture of rainwear, all-weather coats, and other outerwear garments designed for protection against water in inclement weather.

It is evident that the imported cotton suede cloths were not temporarily treated for water repellency for the purpose of taking advantage of any loophole in the law. They were required to be water repellent for their intended use in the manufacture of a variety of outerwear garments in which water resistance was essential.

We conclude that the record establishes that the imported suede cloths are "of a kind generally used in the manufacture of articles which are designed to afford protection against water to the extent expected in raincoats, protective sheeting, dress shields, umbrellas and similar articles." They are properly dutiable at 11 per centum ad valorem as waterproof cloth, wholly or in chief value of cotton, within the intendment of paragraph 907 of the Tariff Act of 1930, as modified, supplemented, and amended.

The protests are sustained and judgment will be entered for the plaintiffs.